[Cite as *Suburban Realty, L.P. v. MD Vape & Tobacco, L.L.C.*, 2023-Ohio-3198.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| SUBURBAN REALTY L.P., | : | |
| Appellee, | : | CASE NO. CA2022-04-041 |
| | : | O P I N I O N |
| - vs - | | 9/11/2023 |
| | : | |
| MD VAPE AND TOBACCO, LLC, | : | |
| Appellant. | : | |

APPEAL FROM FAIRFIELD MUNICIPAL COURT
Case No. 2022 CV G 00141

Stephen C. Lane, for appellee.

Blessing & Wallace Law, LLC, and David S. Blessing, for appellant.

**BYRNE, J.**

{¶ 1} MD Vape and Tobacco, LLC ("MD"), appeals from decisions of the Fairfield Municipal Court, which granted Suburban Realty L.P. ("Suburban") a writ of restitution of its premises and dismissed MD's counterclaims. For the reasons that follow, we affirm the trial court's decision.

**I. Factual and Procedural Background**

{¶ 2} Forcible entry and detainer, as authorized by R.C. Chapter 1923, is a

summary proceeding in which certain courts may "inquire" into disputes between landlords who claim tenants or other persons are unlawfully on the landlord's premises and, where appropriate, order restitution of the premises to the landlord. R.C. 1923.01(A); *Miele v. Ribovich*, 90 Ohio St.3d 439, 441 (2000).

{¶ 3} On February 14, 2022, Suburban filed suit against MD for forcible entry and detainer ("FED") of premises it leased to MD. Suburban also set forth a claim for rent owed from November 2021 through January 2022. The lawsuit concerned a retail unit in a shopping center that MD leased from Suburban. The record reflects service of the complaint and summons on MD the following day, February 15, 2022.

{¶ 4} Suburban attached a copy of its "retail lease agreement" to the complaint. The lease agreement was for one year with an option to renew the lease for a period of five years. In Section 6(A) of the lease agreement, dated September 3, 2020, MD agreed to:

> Use and occupy the premises in a safe and proper manner for the sole purpose of a <u>vape, tobacco, clothing, computer repair</u> and comply with all laws, regulations and rules applicable to its operations. * * * **Tenant will not violate Landlord's no-compete clause with Verizon Wireless. The clause states: "Tenant will not compete with Verizon Wireless or any other phone-related services."**

(Emphasis in original.) In this section of the lease agreement, there is a handwritten notation stating, "Abide by Exhibit 'B' 'E' 'G' 'F.'" Exhibit F, titled "NOXIOUS/EXCLUSIVE USES" states the following:

> Landlord shall not lease, consent to the sublease, or consent to the assignment of any lease, for any space in or on the Center, to competitors of Verizon Wireless or permit occupancy of retail space by companies selling Verizon Wireless Services or any other phone related services.

Suburban alleged in its complaint that MD was in violation of this agreement by "selling products which compete with Verizon Wireless or any other phone related services."

{¶ 5} The matter proceeded to a bench trial on April 5, 2022. The trial was audio-

recorded but due to poor audio quality, a transcript could not be prepared. Pursuant to App.R. 9(C), the parties have submitted a statement of the evidence, which we summarize below.

## A. The Trial

### 1. Suburban's Case in Chief

### a. Anthony Colombo's Testimony

{¶ 6} Anthony Colombo testified that he was Suburban's representative. He communicated with MD concerning the premises located at 5174A Pleasant Avenue, Fairfield, Ohio ("the MD premises"). The MD premises are in a strip shopping center. Suburban leased a portion of the same shopping center to a Verizon Wireless retail store. The lease included the provisions prohibiting MD from selling phone-related services, as described above.

{¶ 7} Colombo testified that a few months after MD's lease began, Suburban received complaints that MD was advertising and selling phones and phone-related services at the MD premises. On November 18, 2020, Colombo sent a letter (entered into evidence as Plaintiff's Exhibit 4) to MD in which he informed MD that Suburban had received these complaints. He requested that MD comply with all covenants in Section 6(A) of the lease agreement and noted that compliance was "extremely important." Colombo warned that failure to comply would result in Suburban retaking possession of the MD premises and terminating the lease.

{¶ 8} Colombo testified that almost a year later, on November 8, 2021, MD sent Suburban a letter exercising its option to renew the lease for an additional five years. Colombo stated that prior to this letter, he had been in contact with VIP Wireless & Smoke Shop ("VIP"), a competitor of MD, who wanted to lease the MD premises at a higher rental price.

{¶ 9} After receiving the November 8 letter from MD, Colombo responded with a November 20, 2021 letter (entered into evidence as Defendant's Exhibit A) stating that MD's attempt to exercise the option was invalid because it was untimely under the terms of the lease and for other reasons, including MD's violations of Section 6(A) of the lease. Colombo informed MD that it must vacate the MD premises by November 30, 2021.

{¶ 10} On November 30, 2021, Colombo sent a letter (entered into evidence as Plaintiff's Exhibit 5) to MD in which he again informed MD that Suburban had received "notice" that MD was advertising and providing mobile phone sales and services from the MD premises. In the letter, Suburban demanded that MD immediately cease and desist all such activities, and if they did not, Suburban would exercise its right to retake possession of the MD premises.

{¶ 11} Colombo identified a Facebook post (entered into evidence as Plaintiff's Exhibit 3) on MD's Facebook account that referenced the sale of phones by MD, which was dated prior to the start of MD's lease of the MD premises.

{¶ 12} In February 2022, Colombo directed a representative to post a notice instructing MD to vacate the MD premises. The reason indicated on the notice to vacate was "Selling phone related material and services that competed with Verizon Wireless in violation of paragraph 6(A) of your Lease."

### b. Maxim Alexander Engel's Testimony

{¶ 13} Maxim Engel testified that he went to the MD premises in November 2021, and talked to a clerk about purchasing a phone. The clerk, a man named Mohammed, told Engel to come back in two hours. Engel returned and Mohammed sold him a phone for $250. Engel stated that he subsequently returned the phone to MD and received a full refund. Engel identified Plaintiff's Exhibit 6 as the receipt for his return of the phone. The receipt, dated November 25, 2021, features the name "MD VAPE & TOBACCO" at the top

and indicates a "CASH REFUND" of $250.

{¶ 14} On cross-examination, Engel testified that he was a VIP employee and that his supervisor at VIP had directed him to go to the MD premises to try to purchase a phone. Engel testified that he did not know the reason his supervisor sent him to the MD premises to make this purchase. Engel testified that his supervisor directed him to ask for "Mohammed."

### c. Yamechtri Kenoz Lee Perry's Testimony

{¶ 15} Yamechtri Kenoz Lee Perry testified that he and an individual named Isaiah D. Adkins went to the MD premises in January 2022. Perry asked a clerk named Mohammed to change his phone service provider. Mohammed told Perry to come back later that day. When he returned, Mohammed gave Perry his phone with a new cell phone service provider. Mohammed charged Perry $130, which included one month of new phone service. Perry identified Exhibit 8 as the receipt for the phone service he purchased. The receipt, dated January 29, 2022, features the name "MD VAPE & TOBACCO" at the top, lists "1 Custom Item" for $130, and indicates that whoever purchased the item paid $140 in cash and was tendered $10.

{¶ 16} Perry admitted that he was a VIP employee and that his VIP supervisor had directed him to go to the MD premises to try to get phone service. Perry also stated that he knew Mohammed was a former employee of VIP and that his supervisor had directed him to ask for "Mohammed."

### d. Isaiah D. Adkins' Testimony

{¶ 17} Isaiah D. Adkins testified that he went with Perry to the MD premises in January 2022 and heard the conversation between Mohammed and Perry about changing phone service. Adkins admitted that he was a VIP employee and his VIP supervisor had directed him and Perry to go to the MD premises and try to get phone service. He also

confirmed that his supervisor had directed him to ask for "Mohammed."

### 2. MD's Case in Chief

### a. Saad Alshafie

{¶ 18} Saad Alshafie testified that he was MD's owner. Alshafie stated that MD did not sell phones or phone-related services. At the time that the lease was signed, Alshafie owned MD with Mohammed Asaf. However, in August 2021, Alshafie purchased Mohammed's membership interest and Alshafie became the sole owner. Mohammed continued to work at the business to train a new clerk as he transitioned out of the business. Alshafie testified that he was unaware of any violations of the lease.

### b. Heather Merritt

{¶ 19} Heather Merrit testified that she was an MD clerk and that she was trained by Mohammed. She was hired in the fall of 2021 and had worked at the MD premises since that time. She was not aware of any phones or phone-related services being sold at the MD premises.

### B. MD Files Counterclaims

{¶ 20} The court continued the trial in progress until April 19, 2022. According to Suburban's appellate brief, immediately before the trial resumed on April 19, 2022, MD filed a handwritten "Answer and Counterclaim with Jury Demand." This filing was made 64 days after service of Suburban's FED complaint and summons. There is no indication in the record that MD sought leave of court to file its answer and counterclaims.

{¶ 21} In its counterclaims, MD alleged that Suburban had entered into an unlawful conspiracy with VIP in violation of Ohio's Valentine Act, and that MD had been injured in an amount exceeding $25,000. MD further alleged that Suburban breached its lease with MD and had caused damages exceeding $25,000.

{¶ 22} The same day, the municipal court, through its magistrate, issued an entry

dismissing MD's counterclaims for being untimely filed. The entry indicated that the untimeliness was "acknowledged by [MD]." The municipal court judge adopted the magistrate's entry on the same day.

{¶ 23} Also on April 19, the magistrate issued a decision granting Suburban a writ of restitution. A "writ of restitution" is an order issued in conjunction with a FED action restoring possession of premises to the landlord. *See Morrow v. Gates*, 12th Dist. Preble No. CA91-11-021, 1992 WL 156116, *1 (June 29, 1992). The court found that Suburban was entitled to a writ because, "Tenant violated a material term of the lease, to wit: the sale or service of cell phones." The municipal court judge adopted this decision on the same day.

{¶ 24} MD appealed and presents two assignments of error.

## II. Law and Analysis

### A. Whether Civ.R. 53(D)(3)(b) is Applicable in a FED Action

{¶ 25} Before addressing MD Vape's two assignments of error, we must address a preliminary issue raised by Suburban.

{¶ 26} Civ.R. 53(D)(3)(b)(i) provides that "A party may file written objections to a magistrate's decision within fourteen days of the filing of the decision, whether or not the court has adopted the decision during that fourteen-day period * * *." Civ.R. 53 further describes the process by which objections to a magistrate's decision are made and considered. Civ.R. 53(D)(3)(b)(iv) underscores the importance of making such objections, as it provides that "Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion * * * unless the party has objected to that finding or conclusion as required by Civ.R. 53(D)(3)(b)." In other words, "Should a party fail to properly object [to a magistrate's decision], that party has waived the right of appeal except for plain error." *Paeltz v. Paeltz*, 12th Dist. Warren No. CA2022-05-031, 2022-Ohio-3964, ¶ 14.

{¶ 27} MD did not object to the magistrate's decisions in this case. Instead, MD simply noticed its appeal of the trial court's adoption of those decisions. Suburban argues that MD's failure to object through the process set forth in Civ.R. 53(D)(3)(b) renders this appeal subject to a review for plain error only pursuant to Civ.R. 53(D)(3)(b)(iv).

{¶ 28} In *Colonial Am. Dev. Co. v. Griffith*, 48 Ohio St.3d 72 (1990), the Ohio Supreme Court held that a different provision of Civ.R. 53, the automatic stay provision, did not apply to FED actions. *Id.* at syllabus. The Ohio Supreme Court applied Civ.R. 1(C), which provides that the Civil Rules, "to the extent that they would by their nature be clearly inapplicable," shall not apply to procedure in FED actions. The *Griffith* court based its decision on the potential for delay in applying the Civ.R. 53 automatic stay provision in FED actions, which are intended to be summary proceedings. The court held:

> If judgment is entered against a defendant in a forcible entry and detainer action, he or she may delay execution and thereby eviction by filing a timely appeal pursuant to App.R. 4 and by posting a supersedeas bond. This procedure has the advantage of protecting the interests of both parties to the action.

*Id.* at 73-74.

{¶ 29} Construing *Griffith*, the Second District Court of Appeals suggested that the objection provisions within Civ.R. 53—as opposed to the automatic stay provision at issue in *Griffith*—are not applicable in FED actions. *Kettering Square Apts. v. Crawford*, 2d Dist. Montgomery Nos. 27504, 27545, and 27548, 2017-Ohio-9054, ¶ 10-12. The Second District noted that Civ.R. 53's objection requirements create a "procedural quagmire" when applied to FED actions, and specifically noted those aspects of Civ.R. 53(D)(3)(b) that are inconsistent with a summary proceeding, especially in light of *Griffith*'s holding that Civ.R. 53's automatic stay provision is also inapplicable. *Id.* at ¶10. Those delays include the 14-day period to file objections, the delay in obtaining a transcript for the trial court's use in

reviewing the decision, and the delay associated with potential supplemental objections after the preparation of the transcript. *Id.*

{¶ 30} We agree with the reasoning set forth in *Crawford*, that, in light of the holding of *Griffith*, the objection provisions of Civ.R. 53(D)(3)(b) are, by their nature, "clearly inapplicable" to FED proceedings due to their summary nature. Civ.R. 1(C). Accord *Summit Mgt. Servs. v. Gough*, 9th Dist. Summit No. 19714, 2000 WL 1226605, *4 (holding that a tenant was "not entitled to file objections to the magistrate's decision" in a FED action pursuant to Civ.R. 1(C) because a FED action is a "summary proceeding").

{¶ 31} We note that in *Milton v. Pierce*, 12th Dist. Clermont No. CA2016-03-013, 2017-Ohio-330, this court held, in an appeal of a FED action, that the appellant-tenant waived his argument on appeal by failing to file objections to a magistrate's decision. *Id.* at ¶ 20. However, in *Milton* we did not analyze the issue of whether Civ.R. 53's objection provisions were "clearly inapplicable" in FED actions under Civ.R. 1(C) and that issue was apparently never raised by the parties. To the extent that we held in *Milton* that Civ.R. 53(D)(3)(b) applied in FED actions, we overrule that holding. For these reasons, we find that we are not constrained by a plain error review under Civ.R. 53(D)(3)(b)(iv) in this case.

**B. Materiality of the Lease Violation and Evidence Supporting Grant of Writ of Restitution**

{¶ 32} MD's first assignment of error states:

{¶ 33} THE TRIAL COURT ERRED BY GRANTING JUDGMENT IN FAVOR OF APPELLEE AS TO THE POSSESSION OF THE MD PREMISES.

{¶ 34} MD argues that the municipal court erred by ignoring evidence of a conspiracy to "create and propagate a technical lease violation." MD argues that instead of focusing on the alleged conspiracy, the trial court wrongly focused on whether the lease term violated was a "material term." MD argues that in light of the alleged conspiracy, the court should have found that MD's alleged breach was immaterial and found no breach.

{¶ 35} MD also argues that the record did not support the trial court's finding that it violated the lease agreement by selling phones or phone-related services, suggesting that the actions of Mohammed were a "side operation" that did not constitute a material breach of the lease agreement.

### 1. Whether the Breach was "Material."

{¶ 36} MD argues that the alleged violation of the lease agreement (that is, selling phone-related services) was merely "technical," did not harm Suburban, and was not a "material" breach of the lease agreement justifying forfeiture of MD's option to renew the lease agreement. MD argues that the alleged conspiracy between VIP and Suburban should have been a consideration in determining whether there was a "material" breach of the lease agreement.

### a. Standard of Review

{¶ 37} The question of whether a party has materially breached a contract is a question of fact. *Investor Support Serv., L.L.C. v. Dawoud*, 12th Dist. Warren No. CA2020-09-060, 2021-Ohio- 2293, ¶ 22. The issue is subject to a manifest weight of the evidence standard of review. *Id.* "The standard of review for a manifest weight challenge in a civil case is the same as that applied to a criminal case." *Skyward Learning Servs., Inc. v. Gray*, 12th Dist. Butler No. CA2019-08-140, 2020-Ohio-1182, ¶ 10. *Accord Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 17.

{¶ 38} When considering a challenge to the manifest weight of the evidence, this court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice warranting reversal and a new trial ordered. *Hacker v. House*, 12th Dist. Butler No. CA2014-11-230, 2015-Ohio-4741, ¶ 21, citing *Eastley* at ¶ 20. A judgment will not be reversed as being against the manifest

weight of the evidence where the "judgment is supported by some competent, credible evidence going to all essential elements of the case." *Ashburn v. Roth*, 12th Dist. Butler Nos. CA2006-03-054 and CA2006-03-070, 2007-Ohio-2995, ¶ 26. In making this determination, an appellate court generally defers to the trier of fact on issues of credibility. *Frisby v. Solberg*, 12th Dist. Butler No. CA2015-11-204, 2016-Ohio-7644, ¶ 8.

**b. Analysis**

**{¶ 39}** In support of its argument that the breach of the lease agreement was not "material," and equity should have intervened, resulting in no finding of breach, MD cites *O'Brien v. Ohio State Univ.*, 10th Dist. Franklin No. 06AP-946, 2007-Ohio-4833, and *Blenheim Homes, Inc. v. Mathews*, 119 Ohio App. 44 (10th Dist.1963).

**{¶ 40}** *O'Brien* involved the termination of a college basketball coach's contract for a possible violation of NCAA rules. *Id*. at ¶ 1. In finding that the breach was not material and affirming the court of claims' holding that termination of the contract was not justified, the Tenth District observed:

> At common law, a "material breach" of contract is a party's failure to perform an element of the contract that is "so fundamental to the contract" that the single failure to perform "defeats the essential purpose of the contract or makes it impossible for the other party to perform." 23 Williston on Contracts, Section 63:3. As applied to the facts here, based on our review of the contract itself, and the relevant testimony, we agree with the trial court's determination that NCAA compliance was but one of O'Brien's many duties. (Liability, 2006-Ohio-1104, at ¶ 38.) That said, failure to strictly comply with NCAA rules does not entirely frustrate the purpose of the contract, unless it were true that every time a coach or player within the NCAA's jurisdiction commits a violation of its rules, that athlete or coach (or the member school) is barred from competition. In other words, at common law, the Radojevic loan could have constituted a material breach if the NCAA had determined that the loan was a major infraction warranting a lengthy suspension from NCAA competition. For the purposes of this inquiry, however, the common law material-breach analysis is circuitous, because it cannot be determined independent of the NCAA's findings. Again, OSU did not wait for the NCAA to make

such a determination, and, essentially, OSU substituted its own judgment for that of the NCAA to make its own determination, which tends to controvert the very heart of the parties' agreement vis-à-vis Section 5.1(b).

*Id.* at ¶ 56.

{¶ 41} *Blenheim Homes* involved a FED action against a land installment contract purchaser who had failed to make August and September, 1961 installment payments until September 21, 1961, when the purchaser made those payments with interest and all other amounts due. *Id.* at 48. The vendor sought forfeiture of the purchaser's interest in the property pursuant to the contract. *Id.* at 46. In reversing the trial court's order for forfeiture, the Tenth District observed that,

> [s]imple contract law has always distinguished between a material breach and an immaterial breach. A man may breach his contract but that does not necessarily void the contract or excuse performance by the other. If the breach is immaterial, the contract is still enforceable although subject to damages.

*Id.* at 48. In ruling in favor of the purchaser, the Tenth District focused upon the lower court's equitable power to ignore a contractual provision which acts as an unreasonable penalty. The Tenth District held that,

> [w]here any provision of a contract (be it time of the essence, express forfeiture or both) operates as an unreasonable penalty, equity will declare it void as against public policy. Subject to the court's sound discretion, the relief granted may be to balance the equities or to decree a right to redeem. The contract provisions are, of course, factors to be considered together with all the other circumstances in determining whether an unreasonable penalty exists.

*Id.*

{¶ 42} In a case with a factual scenario very similar to the one presented in this case, the Sixth District Court of Appeals considered a restrictive covenant that prevented a lessor from leasing space for billboards that advertised competing motels or hotels. *Russell v. Ohio Outdoor Advertising Corp.*, 122 Ohio App.3d 154 (6th Dist.1997). In *Russell*, the

lessor had sold adjoining land to a motel franchise and, as part of the sale, the lessor agreed to a restrictive covenant that prevented him from leasing space for billboards that advertised competing motels or hotels. *Id.* at 156. A subsequent lease to an advertising company contained a restriction against hotel or motel advertising. The advertising company violated the restriction against advertising hotels or motels and the motel franchise threatened legal action against the lessor for breach of the restrictive covenant it purchased along with the adjoining land. *Id.* In finding that the advertising company had materially breached the lease agreement, the Sixth District held:

> The motel/hotel advertising prohibition was critical to appellant's interest, since he had limited the use of his property by entering into the restrictive covenant with his adjoining landowner. By keeping the advertising in place, appellee subjected appellant to a potential cause of action and exposed him to possible damages. In other words, appellee deprived appellant of a reasonably expected benefit—the right not to be subject to a possible lawsuit from his neighbor.

*Id.* at 158-59.

{¶ 43} The *Russell* court also observed that Ohio's courts have relied upon Restatement of the Law 2d, Contracts (1981) 237, Section 241 in determining whether the breach of a contract is material:

> The Restatement sets forth five factors to consider in determining whether there has been a material failure of performance:
>
> "(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> "(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> "(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> "(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the

circumstances including any reasonable assurances;

"(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing."

*Id.* at 158.

{¶ 44} In the court of claims decision preceding the appeal in *O'Brien*, the court distinguished *Russell*, observing that

[i]n *Russell* the advertising restriction was absolute, there were no exceptions. Here, Section 5.1(b) of plaintiff's employment agreement clearly contemplates a scenario whereby plaintiff could retain his employment during the pendency of a major infractions investigation by the NCAA. Thus, the breach in this case is not nearly as critical to the parties' agreement as the breach considered by the court in the *Russell* case.

*O'Brien v. Ohio State Univ.*, Ct. of Cl. No. 2004-10230, 2006-Ohio-1104, ¶ 157.

{¶ 45} In the case before us, as in *Russell*, the lease agreement's restriction on selling phone-related services was absolute and there were no exceptions. This term of the lease agreement was clearly important to Suburban as demonstrated in the repeated admonitions not to compete with Verizon Wireless in the agreement as well as the fact that Suburban sent two warning letters to MD to cease violating the conditions of the lease. MD ignored those letters and continued violating the lease well after the letters were sent. Moreover, it is obvious why Suburban would want MD to respect this provision of the lease. Suburban would want to be protected from any legal action by Verizon Wireless for a violation of its separate non-compete agreement, as was referenced in the lease agreement. Moreover, Suburban potentially faced the loss of Verizon Wireless as a tenant should the non-compete be violated through MD's actions.

{¶ 46} The loss of Verizon Wireless as a tenant would clearly harm Suburban as it would result in monetary loss. And finding a replacement tenant of the same quality as a Verizon Wireless retail store could be arduous. In such a case, it would be difficult for

Suburban to be "adequately compensated" for the loss of its tenant. *Russell* at ¶ 158. Therefore, we agree with the municipal court's conclusion that the lease agreement restriction on competing with Verizon Wireless was a material aspect of the lease agreement and that MD's breach was material.

### 2. Evidence Demonstrating Breach

{¶ 47} MD argues that "There is no evidence that MD was engaged in the sale of phones or phone products." To the contrary, we find that the record contains competent, credible evidence that MD was engaged in the sale of phone-related services, in violation of section 6(A) of the retail lease.

{¶ 48} As described previously, Suburban produced three witnesses who described purchasing phone-related services from an MD employee named Mohammed. The witnesses produced corroborating receipts at trial, all of which were printed with the words "MD VAPE & TOBACCO" at the top.

{¶ 49} Alshafie and Merritt both confirmed an individual named Mohammed worked at MD. And there was evidence that MD had been in the business of selling phone-related services prior to the lease date.

{¶ 50} Alshafie and Merritt may have denied that phone-related service sales were occurring on the MD premises, but the trial court was not required to credit their testimony. "The fact finder is free to believe all, part, or none of the testimony of each witness who appears before it." *Hill v. Briggs*, 111 Ohio App.3d 405, 411 (10th Dist.1996).

{¶ 51} MD suggests that Mohammed may have been selling phones as a "side operation." However, there was no evidence submitted of a "side operation." And the receipts printed with "MD VAPE & TOBACCO" at the top would suggest otherwise. Regardless, the magistrate could conclude that Mohammed was at the time employed by MD and he was conducting this prohibited business on MD premises. The argument that

this was somehow not a violation of the lease because it was being carried out as a "side operation" is meritless.

### 3. Equity and the "Conspiracy"

{¶ 52} Finally, MD criticizes the trial court's decision because it disregarded an alleged conspiracy between VIP and Suburban. The evidence that VIP was willing to lease the MD premises for a higher rate, that Mohammed was a former VIP employee, and that VIP directed its employees to purchase cell phones or cell-phone services from Mohammed is suspicious, but it also does not establish that Suburban was a party to a conspiracy.

{¶ 53} In any event, whether there was a "conspiracy" or not is irrelevant to the evidence Suburban produced demonstrating a breach of the lease by MD. That is to say, whether VIP and Suburban conspired does not change the fact that MD was independently engaging in behavior that constituted a material breach of its lease with Suburban.

{¶ 54} The Engel and Perry transactions are akin to an undercover narcotics agent purchasing drugs from a suspect. The fact that such a drug purchase may be a set-up does not make the drug sale any less a violation of law than the current situation would make the sale of phone-related services any less a violation of the lease agreement.

{¶ 55} For these reasons, we find that competent, credible evidence supported the municipal court's finding that MD breached the lease terms, entitling Suburban to restitution of the MD premises. We overrule MD's first assignment of error.

### C. Dismissal of Counterclaims

{¶ 56} MD's second assignment of error states:

{¶ 57} THE TRIAL COURT ERRED BY FAILING TO CERTIFY THIS MATTER TO THE COURT OF COMMON PLEAS UPON DEFENDANT'S FILING OF A COUNTERCLAIM THAT EXCEEDED THE JURISDICTIONAL LIMITS OF THE MUNICIPAL COURT.

{¶ 58} In support of its second assignment of error, MD argues that the municipal

court, by dismissing MD's counterclaims, erred in two respects.

**{¶ 59}** First, MD argues that the court was statutorily required, under R.C. 1901.22(E), to transfer the case to the common pleas court upon MD's filing of its counterclaims. R.C. 1901.22(E) states that when a counterclaim "in which the amount claimed * * * in any * * * counterclaim exceeds the jurisdictional amount" of the municipal court, the municipal judge "shall certify the proceedings in the case to the court of common pleas * * *." We have held that the "shall certify" language is mandatory. *State ex rel. Pennington v. Fiehrer*, 12th Dist. Butler No. CA93-08-0167, 1993 WL 491631, *2 (Nov. 29, 1993) ("The simple language of R.C. 1901.22(E) * * * suggests that a municipal court has no choice but to certify or transfer a case where a counterclaim exceeds the applicable jurisdictional ceiling[,]" and this obligation is "not discretionary").

**{¶ 60}** MD's counterclaims sought damages exceeding the jurisdictional amount of the municipal court. But rather than immediately certify the case to the Butler County Court of Common Pleas upon MD's filing of its counterclaims, the municipal court magistrate sua sponte dismissed MD's counterclaims. In a terse entry, the municipal magistrate stated, "The Defendant's April 19, 2022, Counterclaim with Jury Demand is hereby dismissed for being filed out of time, which was acknowledged by [MD]." This leads us to MD's second argument. MD argues that Civ.R. 1(C) and R.C. 1923.061, together, provide that MD was permitted to file its counterclaims at any time, even during trial, and that the trial court therefore erred in finding that the counterclaims were untimely filed.

**{¶ 61}** To analyze this issue we must first note the deadline that normally applies to the filing of counterclaims. This deadline arises out of two civil rules. Civ.R. 12(A)(1) requires a defendant to serve its answer to a complaint within twenty-eight days of service of the summons and complaint. Civ.R. 13(A) provides that "A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against

any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim * * *." In other words, a defendant is normally required to file a counterclaim 28 days after service of the summons and complaint. *Mulhollen v. Angel*, 10th Dist. Franklin No. 03AP-1218, 2005-Ohio-578, ¶ 27 ("Generally, a counterclaim, whether compulsory or permissive, must be filed in an answer"). *Accord State ex rel. Collier v. Farley*, 4th Dist. Lawrence No. 05CA31, 2006-Ohio-4901, ¶ 40.

{¶ 62} MD argues that Civ.R. 1(C) "specifically exempts [FED] actions from the civil rules * * *." But MD characterizes Civ.R. 1(C) as saying more than it actually says. The rule does not exempt FED actions from *all* of the civil rules. Civ.R. 1(C) states, more specifically, that the Rules of Civil Procedure "shall not apply to procedure" in certain actions, including FED actions, "to the extent that they would by their nature be clearly inapplicable * * *." Thus, a civil rule must be "clearly inapplicable" to a FED action in order to not apply to a FED action. Relying on Civ.R. 1(C), Ohio courts have routinely held that defendants are not required to file answers in response to FED complaints. *Clark Properties v. Hawk*, 10th Dist. Franklin No. 76AP-490, 1976 WL 190453, *2; *J & E Mgt., Inc. v. Wolf*, 8th Dist. Cuyahoga No. 35563, 1977 WL 201207, *2 (Feb. 10, 1977); *Lauch v. Monning*, 15 Ohio App.2d 112, 114 (1st Dist.1968); *Smith v. Wright*, 65 Ohio App.2d 101, 106 (8th Dist.1979); *Chillicothe Metro. Hous. Auth. v. Anderson*, 4th Dist. Ross No. 1406, 1988 WL 69118, *9 (June 28, 1988); *Kassem v. Barnes*, 1st Dist. Hamilton No. C-190539, 2020-Ohio-4046, ¶ 8. These courts have reasoned that requiring an answer in response to a FED complaint would be inconsistent with the nature of FED actions, which are "summary proceedings designed to obtain a speedy determination of the right of possession of the rightful owner of such property * * *." *Clark Properties* at *2. In other words, *requiring* an answer in a FED action would prolong the proceedings, and therefore, the Civ.R. 12 requirement to file an answer is "clearly inapplicable" given the "nature" of the proceeding.

Civ.R. 1(C).

**{¶ 63}** But while these courts have held that *answers* are not required in response to FED claims, is the same true of *counterclaims*? Neither the Rules of Civil Procedure nor the Revised Code provide an explicit answer. However, the FED statute instructs that the answer date for "any other claims" filed with a FED claim "shall be twenty-eight days from the date service is deemed complete under this section." R.C. 1923.06(H)(2). Therefore, the FED statute itself requires that an answer to "any other claims" asserted with a FED claim must be filed within 28 days of the date of service—the same amount of time within which an answer must be filed in a non-FED action pursuant to Civ.R. 12(A)(1). The deadline set forth under R.C. 1923.06(H)(2) suggests that Civ.R. 12(A)(1)'s 28-day deadline to answer a complaint is not "clearly inapplicable" when a landlord files a FED action with "any other claim[]." This also suggests that the deadline for filing counterclaims would not be "clearly inapplicable" under Civ.R. 1(C) in a case in which a FED action is filed with one or more other claims.

**{¶ 64}** The Fourth District Court of Appeals reached a similar conclusion in *Haney v. Roberts*, 130 Ohio App.3d 293 (4th Dist.1998), though its analysis did not rely on or mention R.C. 1923.06(H)(2). In *Haney*, the court concluded that Civ.R. 13(A)'s compulsory counterclaim requirement was "clearly inapplicable" to cases solely involving FED claims under Civ.R. 1(C). *Id.* at 296. The court concluded, though, that a different analysis applied if a FED action is filed with another claim. *Id.* at 300. The court held:

> In summary, we hold that if a landlord files an action for forcible entry and detainer and does not join that action with any other action, the tenant need not file any counterclaims. Civ.R. 13(A) does not apply in forcible entry and detainer actions to require tenants to assert compulsory counterclaims. Pursuant to R.C. 1923.081, the tenant may assert claims against the landlord in a later action. If, however, the landlord joins another action with the forcible entry and detainer action, Civ.R. 13(A) does apply to that other action and, consequently, the tenant must assert compulsory counterclaims.

*Id.* at 300. We conclude the same in this case, where Suburban filed not only a FED claim, but also a claim for rent owed from November 2021 through January 2022. That is, in this case, the 28-day deadline for the filing of counterclaims was not "clearly inapplicable" under Civ.R. 1(C).[1]

**{¶ 65}** Because the 28-day deadline to file a counterclaim applies in this case, we reject MD's argument that its answer and counterclaim were timely filed.

**{¶ 66}** But MD has a second argument. MD argues that a different statute within the FED statutory framework, R.C. 1923.061, permitted it to file a counterclaim even during the trial. That statute, entitled "Defenses; counterclaim" provides:

> (A) Any defense in an action under this chapter may be asserted at trial.
>
> (B) In an action for possession of residential premises based upon nonpayment of the rent or in an action for rent when the tenant or manufactured home park resident is in possession, the tenant or resident may counterclaim for any amount the tenant or resident may recover under the rental agreement or under Chapter 4781. or 5321. of the Revised Code. In that event, the court from time to time may order the tenant or resident to pay into court all or part of the past due rent and rent becoming due during the pendency of the action. After trial and judgment, the party to whom a net judgment is owed shall be paid first from the money paid into court, and any balance shall be satisfied as any other judgment. If no rent remains due after application of this division, judgment shall be entered for the tenant or resident in the action for possession. If the tenant or resident has paid into court an amount greater than that necessary to satisfy a judgment obtained by the landlord, the balance shall be returned by the court to the tenant or resident.

**{¶ 67}** MD states in its brief that "the Eighth District Court of Appeal has held that 'R.C. 1923.061 permits filing certain counterclaims arising out of the landlord tenant relationship as late as the day of trial.'" MD quotes from *Swaney v. Syndicate Mgt., Inc.*,

---

1. This case does not present the question or require us to decide whether counterclaims must be filed when a landlord only files a FED claim, and no other claim.

8th Dist. Cuyahoga No. 71422, 1997 WL 209223, *3 (April 24, 1997). In its appellate brief, MD did not specify which subsection of R.C. 1923.061—that is, subsection (A) or (B)—it believes entitled it to file an untimely counterclaim on the second day of trial. *Swaney* also did not state whether its conclusion that "R.C. 1923.061 permits filing certain counterclaims arising out of the landlord tenant relationship as late as the day of trial," was drawn from the (A) or (B) subsections. Nor did it explain its reasoning in stating this conclusion. Instead, *Swaney* cited three cases as legal authority for this proposition.

{¶ 68} The first case, *Shaffer v. Mease*, 66 Ohio App.3d 400 (4th Dist.1991), involved a landlord-tenant FED action in which the landlord sought restitution of the premises and unpaid rent from a residential tenant. *Id.* at 402-403. The Fourth District referenced, but did not specifically cite R.C. 1923.061(A), and concluded "Therefore, appellant had no obligation to orally notify appellee of his filing of the counterclaim one day prior to trial. Indeed, appellant would have been legally justified pursuant to R.C. 1923.061 in waiting until trial to have asserted his counterclaim." *Id.* at 408.

{¶ 69} The second case, *Smith v. Wright*, 65 Ohio App.2d 101 (8th Dist.1979), involved a landlord bringing a FED action seeking eviction of a residential tenant for nonpayment of rent. *Id.* at 102. The Eighth District referred to a tenant's ability to file a counterclaim under R.C. 1923.061(B), and the tenant's ability to file a counterclaim at an eviction hearing, at least in certain circumstances. *Id.* at 105. But whether and when counterclaims filed at FED hearings were timely was not before the court, as the counterclaim in *Smith* was filed after the filing of the notice of appeal from the trial court's FED decision. *Id.* at 102.

{¶ 70} The third case, *Laster v. Bowman*, 52 Ohio App.2d 379 (8th Dist.1977), also involved a FED action against a residential tenant. *Id.* at 380. But while the court referenced a tenant's ability to file a counterclaim in a FED action referring to language set forth in R.C.

1923.061(B), the court did not address the question of timeliness. *Id.* at 391.

**{¶ 71}** Thus, of the three cases cited by the court in *Swaney*, only the *Shaffer* case arguably lends some support to *Swaney's* holding that "R.C. 1923.061 permits filing certain counterclaims arising out of the landlord tenant relationship as late as the day of trial." *Swaney*, 1997 WL 209223 at *3. And the court in *Shaffer* did not explain its conclusion that the reference to "any defense" in R.C. 1923.061(A) includes a "counterclaim." We do not find these cases persuasive. We will now conduct our own analysis of R.C. 1923.061(A) and (B).

### 1. Does R.C. 1923.061(A) Permit Untimely Counterclaims to be Asserted at Trial?

**{¶ 72}** Upon our review of the plain language of R.C. 1923.061(A), we do not agree that its reference to "any defense" includes counterclaims. Instead, we find that the ordinary meaning of "any defense" refers to legal defenses to the claims set forth by the plaintiff and does not refer to counterclaims. Underscoring this interpretation is the fact that R.C. 1923.061(B) expressly refers to "counterclaims," which shows the legislature knew the distinction between "defenses" and "counterclaims."

**{¶ 73}** Our interpretation of R.C. 1923.061(A) is consistent with the summary nature of FED proceedings. As previously mentioned, there are multiple cases holding that an answer is not required in response to a FED claim, at least when the FED claim is filed alone, without other claims. This makes sense in the context of FED actions as they are "summary proceedings designed to obtain a speedy determination of the right of possession of the rightful owner of * * * property * * *." *Clark Properties*, 1976 WL 190453 at *2. But the same cannot be said of counterclaims, particularly when a FED claim is filed with another claim. We have already noted that R.C. 1923.06(H)(2) anticipates the filing of an answer when a FED claim is filed with another claim, as here. There is no reason to believe counterclaims should be any different.

- 22 -

{¶ 74} Again, R.C. 1923.061(A) says that "defenses" (which are raised in answers) may be raised at the FED action trial. But the statute omits "counterclaims" from this language. The legislature made a deliberate choice. That choice is consistent with R.C. 1901.22(E), which provides that a municipal court "shall certify" a FED action to a common pleas court when a counterclaim is filed that exceeds the municipal court's jurisdiction. In this statute, the legislature anticipated that a counterclaim above $15,000 must postpone resolution of a FED action, despite the FED action's summary nature. It seems unlikely the legislature would have intentionally provided that the parties and court could expend the time and expense involved in trial (including multi-day trials like this one), only to have all that time and expense wasted when a counterclaim seeking more than $15,000 was filed during trial, requiring certification to the common pleas court. It seems more likely that the legislature omitted "counterclaims" from R.C. 1923.061(A) specifically to avoid this type of situation.

{¶ 75} The Tenth District Court of Appeals shares our interpretation of R.C. 1923.061. In *Clark Properties*, the court stated:

> Forcible entry and detainer actions are considered summary proceedings designed to obtain a speedy determination of the right of possession of the rightful owner of such property, and such proceedings are exempted from the requirements of the Ohio Rules of Civil Procedure by virtue of Rule 1(C). Therefore, an answer need not be filed in a forcible entry and detainer action for possession only, and all defenses may be presented orally at trial, pursuant to R. C. 1923.061(A).

> However, we conclude that R. C. 1923.061(A), which gives the defendant the right to raise mere defenses at the trial of such action for repossession does not give the same preferential treatment to counterclaims. R. C. 1923.061(B), referring to counterclaims, sets forth in pertinent part as follows:

> "In an action for possession of residential premises based upon nonpayment of the rent * * * the tenant may counterclaim for any amount he may recover under the rental agreement or under Chapter 5321 of the Revised Code. * * *"

> We hold these sections to mean that defenses can be asserted at the trial notwithstanding the failure to include them in the responsive pleading, while counterclaims if they are to be recovered upon must be asserted not at trial but prior to trial, just as counterclaims in any other actions governed by the Civil Rules.
>
> This position is strengthened by virtue of the provisions of R. C. 1923.081, which states as follows:
>
> "A trial on an action in forcible entry and detainer for residential premises pursuant to Chapter 1923. of the Revised Code may also include a trial on claims of the plaintiff for past due rent and other damages under a rental agreement, unless for good cause shown the court continues the same. For purposes of this section, good cause includes the request of the defendant to file an answer or counterclaim to the claims of the plaintiff or for discovery, in which case the proceedings shall be the same in all respects as in other civil cases. If, at the time of the trial, the defendant has filed an answer or counterclaim, the trial may proceed on the claims of the plaintiff and the defendant."
>
> According to such section, where the defendant wishes to file an answer or counterclaim, or moves for discovery proceedings, good cause would be shown for the trial court's continuance of the matter, and it would proceed as in other civil cases.

1976 WL 190453 at *2.

{¶ 76} We agree with the reasoning set forth in *Clark Properties*. Accordingly, we find R.C. 1923.061(A) permits the raising of defenses with respect to a FED action for the first time at trial. However, the raising of untimely counterclaims for the first time at trial is not permitted under R.C. 1923.061(A).

## 2. Does R.C. 1923.061(B) Permit Untimely Counterclaims?

{¶ 77} Having analyzed R.C. 1923.061(A), we turn to R.C. 1923.061(B). The plain language of R.C. 1923.061(B) says nothing, one way or the other, about the ability to file an untimely counterclaim in a FED action. The first sentence of R.C. 1923.061(B) could be read as implicitly suggesting that certain counterclaims can be raised at any time in a FED action, since that sentence says certain counterclaims "may" be brought and does not

mention any timeliness restriction. But that first sentence should be read in the context of the sentences that follow. That is, in the context of the entirety of R.C. 1923.061(B), the first sentence should be read as merely stating that certain counterclaims "may" be filed, and that when they are filed, the court may address past due rent in the manner indicated in the remainder of the paragraph. We do not interpret R.C. 1923.061(B) as permitting untimely counterclaims to be filed during the trial.

**{¶ 78}** On the basis of the foregoing, we do not find that the trial court erred in failing to certify the case to the court of common pleas upon the filing of MD's untimely counterclaims. The court did not err in dismissing these counterclaims for being untimely filed. We overrule MD's second assignment of error.

### III. Conclusion

**{¶ 79}** Competent and credible evidence supported the trial court's determination that MD breached the lease. And the trial court did not err in dismissing MD's untimely filed counterclaims.

**{¶ 80}** Judgment affirmed.

PIPER, P.J., and M. POWELL, J.