[Cite as *Fisher v. Fisher*, 2025-Ohio-2040.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |
|---|---|---|
| JESSIE LYN FISHER, | : | |
| Appellant, | : | CASE NO. CA2024-07-043 |
| | : | |
| - vs - | : | OPINION AND JUDGMENT ENTRY 6/9/2025 |
| | : | |
| PAUL DAVIS FISHER, III, | : | |
| Appellee. | : | |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. 22DR43752

Ernst & Associates, and David E. Ernst, for appellant.

Diehl & Hubbell, LLC, and Martin E. Hubbell, for appellee.

# **O P I N I O N**

**BYRNE, P.J.**

{¶ 1} Jessie Lyn Fisher appeals from the decision of the Warren County Court of

Common Pleas, Domestic Relations Division, which granted her a divorce from Paul

Davis Fisher, III. Specifically, Jessie appeals from aspects of the domestic relations court's decision that divided the parties' marital property and marital debt. For the reasons described below, we affirm.

## I. Factual and Procedural Background

{¶ 2} Jessie and Paul married in 1992. The record reflects that in September 2022, Jessie obtained an ex parte civil protection order against Paul, and he was removed from the marital home. In November 2022, Jessie filed for divorce. There are no minor children at issue.

{¶ 3} During the proceedings, the parties identified contested issues to be determined by the domestic relations court. Relevant to this appeal, those contested issues included Paul's claim to allocate marital credit card debt, Jessie's claim for cash that she asserted Paul removed from a safe in the marital home, and Paul's claim for cash that he allegedly left for Jessie in the marital home. A domestic relations court magistrate held a hearing on these matters. We will summarize the key hearing testimony below.

### A. The Contested Hearing

### 1. Jessie's Testimony

{¶ 4} Jessie testified that in the summer of 2022 she learned information that led her to be concerned about the status of her marriage to Paul. Based on this information, she began paying attention to the financial aspects of her marriage. Before this time, finances had been Paul's responsibility.

{¶ 5} Jessie testified that the parties separated on September 11, 2022. This was also the date that she had Paul served with an ex parte civil protection order and the date that Paul was removed from the home. After service of the protection order, Paul had not been back to the home except when he was there with a police officer to retrieve personal items.

{¶ 6} Jessie claimed to never have had any credit cards during the marriage, and that she had never seen Paul use any credit cards during the marriage. Yet she stated that she had recently learned that six credit cards had been fraudulently opened in her name.

{¶ 7} Jessie testified that she had a business called "The Opry." Paul also had a restaurant business called "The Woodshed." The Woodshed opened in April 2022, but the couple had been working long before that time to find, fix up, and remodel a property.

{¶ 8} Jessie testified that there was a large safe in the basement of the marital home. She and Paul kept cash in that safe. The cash was generated from a food booth business that they operated at festivals.

{¶ 9} Jessie identified an exhibit that was a photograph of this safe with its door open. Jessie testified that this photograph was taken in June 2022. She stated that she knew this date because the Country Musical Festival had just happened and the cash the parties generated from their food booth business was in the safe.

{¶ 10} The photograph depicts a safe with multiple shelves. Jessie testified that the lowest shelf held various bundles or envelopes of cash and the total amount of cash depicted on the shelf was "like a hundred thousand dollars." Even though the exact amount of cash was not determinable from the photograph, Jessie said that she knew how much was in the safe in that photograph because she had helped Paul count the money.

{¶ 11} Jessie stated that she had no access to this safe, that Paul refused to provide her with the combination to the safe, and that she had never opened the safe by herself.

{¶ 12} Jessie testified that in October 2022 (after Paul had been removed from the home), she hired a locksmith to open the safe, with her friend, Brenda Oney, present.

When the locksmith opened the safe, the cash was gone. Jessie identified an exhibit consisting of another photograph of the safe, which was taken after the safe was opened by the locksmith. The drawer, where the cash had been in the previous exhibit, was empty.

{¶ 13} Jessie testified that she was asking the court to reimburse her for half of the $100,000 in cash she asserted Paul removed from the safe—that is, $50,000.

{¶ 14} Jessie denied Paul's claim that he had left her $20,000 in cash around the time when he left the marital home.

### 2. Brenda Oney's Testimony

{¶ 15} Brenda Oney testified that she was friends with Jessie and had been present when the safe was opened by the locksmith. She confirmed that there was no cash in the safe when it was opened.

### 3. Paul Fisher's Testimony

{¶ 16} Paul testified that the photograph depicting cash in the safe must have been taken before October 2021 (that is, long before the June 2022 date testified to by Jessie). Paul explained that he knew this because the photograph depicted flooring tiles on the ground to the left of the safe, and those flooring tiles had been installed in The Woodshed between November and December 2021. Paul stated that Jessie had access to the combination to the safe, and the combination was written down for her in a different safe in the marital home.

{¶ 17} Paul testified that the amount of cash depicted in the photograph was not $100,000, but $41,000. Some of the cash was for the food booth festival business and would be used to make change for people who paid cash. Paul testified that "every dime" of that money had been spent since that photograph was taken. Paul testified that the money was used for various purposes, including improvements to the parties' businesses. He stated that $10,000 was spent making various improvements to The Opry.

{¶ 18} Paul also testified that in August 2022, Jessie was mentally unstable and called him asking him to come home. He stated that he put $20,000 in a black laptop case and left it for her at the marital home. That was the last of the money in the safe. Paul testified that he wanted half of that money, or $10,000, credited to him in the divorce.

{¶ 19} Paul testified about spending and payments on multiple credit cards that occurred while the marriage was ongoing, and after the September 2022 separation date. Paul reviewed various exhibits, which consisted of statements for five credit cards. Paul testified as to his spending on these cards, which he explained were used for various expenses, including the costs of exiting a timeshare property in Florida; for airline, rental car, and other expenses on trips to Florida; for a dog; for expenses related to The Opry; for furniture; and for the funeral expenses of a relative. Paul also explained that he had personally made payments on these various credit accounts after the separation date. Paul asked for reimbursement for half of his payments on the credit cards and that the remaining credit card debt be allocated equally. Paul testified that Jessie was aware of his using credit cards for purchases during the marriage.

**B. Magistrate's Decision on Marital Credit Card Debt**

{¶ 20} After the contested hearing, the magistrate issued a Magistrate's Decision Recommending Divorce.

{¶ 21} The magistrate's decision first addressed Paul's request to allocate credit card debt. The magistrate noted Jessie's testimony that she was unaware that Paul used credit cards and denying that the parties had incurred any credit card debt during the marriage. The magistrate found it "extremely difficult" to believe that despite being married for more than 30 years, Jessie would be unaware that Paul used credit cards. The magistrate observed that the parties travelled and purchased goods and services that could not be paid for with cash. The magistrate found that Jessie's assertion that she did

not know about the credit cards was either the result of deliberate ignorance or a way to avoid responsibility for any credit card debt. The magistrate also found that the credit card debt testified to by Paul was accumulated during the marriage, was for the benefit of both parties, and there was no evidence presented of financial misconduct. The magistrate granted Paul's request to be partially reimbursed for payments he made on the credit cards and ordered this amount to be credited to Paul in the final division of property. The magistrate also ordered the parties to pay the remaining balance of the credit card debt equally.

{¶ 22} The magistrate's decision next addressed the parties' respective testimony and arguments as to cash they believed was owed to them. Ultimately, the magistrate found that both parties were "equally credible," but that neither had proven their case. This was not a statement that the magistrate believed either party, but that the parties' testimony was such that the magistrate did not believe one over the other. The magistrate described the issue as "he said/she said." Accordingly, the magistrate found that Paul was not entitled to half of the $20,000 he claimed to have left Jessie and that Jessie was not entitled to half of the $100,000 she claimed Paul removed from the safe.

### C. Decision on Objections to Magistrate's Decision

{¶ 23} Jessie objected to the magistrate's decision, arguing that the magistrate erred in granting Paul's requests to allocate credit card debt and erred in finding against Jessie on her claim concerning the alleged $100,000 of cash in the safe.

{¶ 24} The domestic relations court issued a decision on Jessie's objections. As to the allocation of credit card debt, the domestic relations court found Jessie's assertions that she was unaware of the credit card debt incurred during the marriage to be unbelievable. The court noted that even if Jessie was ignorant of Paul's use of credit cards, she had a responsibility to ask questions about how Paul was paying for the

couple's expenses. The court also noted that Paul had filed his affidavit of income and expenses, listing considerable credit card debt, nearly a year before the final hearing. The court found that Jessie had time to investigate the credit card debt and never provided any reason prior to trial that she was unprepared to address the issue of marital credit card debt.

{¶ 25} Regarding alleged cash in the safe, the court noted that Jessie's affidavit of income and expenses did not refer to any cash in the safe, let alone $100,000 in cash, and that there was nothing else in the parties' financial circumstances to suggest that they would have $100,000 in cash in their home. The court also noted that Paul was abruptly removed from the home in September 2022 and would not have had access to the safe after that time, and thus no opportunity to remove the cash. Like the magistrate, the domestic relations court found that the evidence submitted by Jessie did not prove the existence of the cash.

{¶ 26} The domestic relations court overruled Jessie's objections and adopted the magistrate's decision in full.

{¶ 27} Jessie appealed, raising one assignment of error.

**II. Law and Analysis**

{¶ 28} Jessie's assignment of error states:

> THE TRIAL COURT ERRED IN OVERRULING PLAINTIFF'S OBJECTION TO THE MAGISTRATE'S DECISION AND NOT AWARDING HER FIFTY THOUSAND DOLLARS FROM A MARITAL SAFE SHE HAD NO ACCESS TO AND PAY CREDIT CARD DEBT OF WHICH SHE HAD NO KNOWLEDGE BASED ON THE EVIDENCE SUBMITTED AT TRIAL.

{¶ 29} Jessie raises two issues in support of this assignment of error. She argues that the domestic relations court erred by (1) ordering her to pay half of the parties' credit

card debt, and (2) not awarding her half of the $100,000 of cash she claimed Paul took from the safe.

**A. Law of Property Division**

{¶ 30} Property division in a divorce proceeding is a two-step process that is subject to two different standards of review. *Garcia v. Garcia Samano*, 2019-Ohio-3223, ¶ 10 (12th Dist.), citing *Smith v. Smith*, 2017-Ohio-7463, ¶ 8 (12th Dist.). First, the domestic relations court must determine "what constitutes marital property and what constitutes separate property." R.C. 3105.171(B). We review the classification of property or debt as marital or separate under the manifest-weight-of-the-evidence standard and will not reverse a domestic relations court's classification if it is supported by competent and credible evidence. *Oliver v. Oliver*, 2011-Ohio-6345, ¶ 8 (12th Dist.); *Renz v. Renz*, 2011-Ohio-1634, ¶ 13 (12th Dist.). In determining whether competent and credible evidence exists, a court of appeals should be guided by the presumption that the findings of the trial court are correct. *Zollar v. Zollar*, 2009-Ohio-1008, ¶ 10 (12th Dist.), citing *Bey v. Bey*, 2009-Ohio-300, ¶ 15 (3d Dist.). This presumption exists because the trial judge is best able to view the witnesses, observe their demeanor, gestures, and voice inflections, and use those observations in weighing the credibility of the testimony. *Id*.

{¶ 31} Second, the domestic relations court then must equitably divide the marital property and separate property between the spouses in accordance with the provisions of R.C. 3105.171. *Smith* at ¶ 9. The domestic relations court has broad discretion to determine an equitable and fair division of the marital estate. *Bauer v. Bauer*, 2020-Ohio-425, ¶ 22, (12th Dist.), citing *Cherry v. Cherry*, 66 Ohio St.2d 348, 355 (1981). This court will not reverse a domestic relations court's decision regarding the division of property in a divorce proceeding absent an abuse of discretion. *Id.* An abuse of discretion implies

that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

## B. Analysis: Credit Card Debt

{¶ 32} For her first issue for review in support of her assignment of error, Jessie contends that the trial court erred in equally dividing the parties' credit card debt. She states that the credit card debt should have been entirely allocated to Paul based on her assertion that she lacked any knowledge of Paul's use of credit cards. Jessie further asserts that Paul testified that all the credit card debt was incurred for improvements to The Woodshed's building, and Paul was awarded that business in the divorce.

{¶ 33} We find that the domestic relations court's classification of the credit card debt as marital property was supported by competent and credible evidence. First, we note that Paul disclosed the credit card debt in his affidavit of income and expenses. Jessie filed numerous motions during the pendency of the divorce and never raised any issues with respect to the credit card debt or any issues with obtaining discovery on Paul's use of credit cards. Second, Jessie's assertion that Paul testified that all the credit card debt was used for his business is unsupported by the record. In fact, Paul testified that the credit cards were used for marital expenses and testified as to the purchases on each credit card. Those purchases related to buying out the parties' timeshare, improvements to Jessie's Opry business, the purchase of a dog, furniture, travel expenses, a relative's funeral costs, and similar marital expenditures. Jessie presented no contradictory evidence and the court found that Paul was credible as to these expenses. Thus, the domestic relations court's classification of the credit card debt as marital was supported by competent and credible evidence. *Oliver*, 2011-Ohio-6345 at ¶ 8.

{¶ 34} Furthermore, we find nothing in the record that would support the conclusion that the domestic relations court abused its discretion by equally allocating the credit card

debt between Jessie and Paul. As stated above, Paul presented competent and credible evidence that the credit card debt was used for marital expenses and thus an equal allocation was reasonable. *See Blakemore*, 5 Ohio St.3d at 219.

**{¶ 35}** Jessie's arguments regarding the trial court's allocation of credit card debt lack merit.

### C. Analysis: Cash in the Safe

**{¶ 36}** For her second issue for review in support of her assignment of error, Jessie argues that the domestic relations court erred by not awarding her $50,000 based on her allegation that Paul removed $100,000 of cash from the safe in the marital home. She argues that the greater weight of the evidence supported her claim that the safe contained $100,000.

**{¶ 37}** Upon review, we find that the domestic relations court's decision declining to award Jessie some amount for cash allegedly in the marital home's safe was not against the manifest weight of the evidence.

**{¶ 38}** The domestic relations court found that Jessie had not proven her case, by a preponderance of the evidence, with respect to cash in the safe. The record supports this conclusion. The only evidence submitted by Jessie in support of her claim regarding the cash was her testimony that the safe contained $100,000 and a photograph that showed bundles of cash in the safe on an indeterminate date and in an indeterminate amount. The amount of money that was depicted in the photograph was never demonstrated through any competent and credible means, and the domestic relations court was free not to believe Jessie's testimony about the total value of the cash.

**{¶ 39}** Further, as noted by the domestic relations court, Jessie filed an affidavit of income and expenses at the beginning of the case and gave no indication that the parties possessed a significant amount of cash. She said nothing about $100,000 in cash that

had disappeared and needed to be accounted for. The court was free to conclude that Jessie's longtime silence about cash in the safe undermined her credibility in later asserting its existence and removal by Paul.

{¶ 40} Given the evidence in the record, and as noted by the magistrate and domestic relations court, this was simply a "he said/she said" situation. No independent proof was offered as to the amount of cash in the safe or when it was in the safe. Under these circumstances we do not find that the domestic relations court's conclusion that Jessie failed to prove the existence of the $100,000 of cash was against the manifest weight of the evidence. The domestic relations court was not required to believe Jessie's testimony. *See Suburban Realty, L.P. v. MD Vape & Tobacco, L.L.C.*, 2023-Ohio-3198, ¶ 50 (12th Dist.).

{¶ 41} Jessie also argues that the court should at least have credited her some amount with respect to cash in the safe (even if less than $50,000) given that Paul testified that the safe contained $41,000. This argument has no merit. Paul only testified that the safe had at one point contained $41,000 and that the money had since been spent on the parties' businesses and other marital expenses.

{¶ 42} For these reasons, we find that the domestic relations court's decision with respect to alleged cash in the safe was supported by competent and credible evidence. *Oliver*, 2011-Ohio-6345 at ¶ 8. Jessie's arguments regarding cash in the safe lack merit.

### III. Conclusion

{¶ 43} Jessie raises two issues in this appeal. In support of both, Jessie essentially argues that the domestic relations court should have believed her and given weight to her testimony. But the domestic relations court was in the best position to evaluate witness credibility and the weight of the testimony. *Zollar*, 2009-Ohio-1008 at ¶ 10. We defer to the domestic relations court in this regard and find no error based on the record before

us. We overrule Jessie's assignment of error.

**{¶ 44}** Judgment affirmed.


HENDRICKSON and M. POWELL, JJ., concur.


## J U D G M E N T   E N T R Y


The assignment of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Warren County Court of Common Pleas, Domestic Relations Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.



/s/ Matthew R. Byrne, Presiding Judge


/s/ Robert A. Hendrickson, Judge


/s/ Mike Powell, Judge