[Cite as *P.A. v. Rorick*, 2023-Ohio-4578.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
FULTON COUNTY

P.A.                                              Court of Appeals No.  F-23-001

      Appellee                             Trial Court No.  22 CV 000142

v.

Jerry Rorick                                **DECISION AND JUDGMENT**

      Appellant                             Decided:  December 15, 2023

* * * * *

Eric R. Wead, for appellee.

Catherine Meehan, for appellant.

* * * * *

**SULEK, J.**

{¶ 1} Appellant, Jerry Rorick, appeals from the December 29, 2022 judgment of

the Fulton County Court of Common Pleas adopting the magistrate's issuance of a civil

stalking protection order (CSPO) against him.  Rorick argues that no credible, competent

evidence supports the magistrate's finding that he committed menacing by stalking

against Appellee, P.A., and therefore the trial court erred in overruling his objections to and adopting the magistrate's order. For the following reasons, the trial court's judgment is affirmed.

## I.     Background

{¶ 2} On August 22, 2022, P.A. filed a petition for a civil stalking protection order against Rorick with the Fulton County Common Pleas Court. The court issued an ex parte CSPO pending a hearing. A hearing was held on September 29, 2022 before a magistrate. P.A., Rorick, and Jeanette testified as follows.

{¶ 3} P.A. was formerly married to Rorick's daughter, Jeanette. While they were married, P.A. and Jeanette lived in California with their two minor children. After divorce proceedings were initiated in California, P.A. and Jeanette entered into a memorandum of understanding (MOU) involving child custody and visitation rights. Jeanette and the children moved into the home of her parents in Wauseon, Ohio in late 2021.

### A. The First Incident

{¶ 4} On January 3, 2022, while P.A. was still residing in California, Jeanette went to enroll the two children at Wauseon schools and take them on an informal tour of the school buildings with the principal. When Jeanette, her mother, and the children arrived at the school, P.A. was already in the principal's office. Jeanette had not told P.A. about the tour, and P.A. did not tell her that he planned to be at the school. Jeanette, believing

2.

that the MOU required P.A. to give two weeks' notice before seeing the children in any circumstance, became upset and called Rorick.

{¶ 5} After finishing part of tour, the family planned to visit another school building where the older child was to attend. As P.A. reached the parking lot of the first school building, he was confronted by Rorick, who was with his son, Christopher. Both parties testified that Rorick told P.A. to get the hell out of there and that he had no right to be there. P.A. testified that Rorick also accused P.A. of abandoning his children, which Rorick denied. Rorick acknowledged, however, that he may have accused P.A. of selling his children because Jeanette gave up the right to child support, spousal support, and the marital property to move to Ohio. Both parties testified that Christopher put his hand on Rorick and told him to calm down. After that, P.A. testified that Rorick said he would let P.A. leave, and both parties testified that the confrontation ended soon after. P.A. resumed the tour without incident. Rorick testified that during this incident, he never threatened P.A. and he never got physically closer to P.A. than one arm's length away. P.A. testified that Rorick did not make any threats of physical harm but nonetheless he felt threatened.

{¶ 6} Rorick and P.A. did not have any contact for the next seven-and-a-half months. During that period, P.A. moved from California to Ohio, but the children continued to reside with Jeanette at her parents' home.

3.

## B. The Second Incident

{¶ 7} On August 7, 2022, P.A. and Jeanette's younger child had a flag football practice at a park. Jeanette notified P.A. of the practice in advance. Rorick and Jeanette took the child to the practice. When they arrived, they saw P.A.'s bicycle was already at the park, and the child became upset and reticent to play. P.A. attempted to comfort the child, but eventually Jeanette took over encouraging him to practice. The testimony of P.A. and Rorick differed on the details of this incident.

### *P.A.'s Testimony*

{¶ 8} According to P.A., while he was comforting the child, Rorick approached him. P.A. testified about the interaction as follows:

> And so I walked over to try and comfort my son and I knelt down and I went to put my hand on his shoulder. [Rorick] pushed my arm away and at that point I stood up. My son …. was still in the area. And so I stood up. [Rorick] stood up and came towards me and said, "Get the hell out of here. You have no right to be here. And I said "That's my son. I am his father. I have every right to be here." And he said a second time "No you don't. You don't have any right to be here. Why don't you get the hell out of here." I say "That's my son. I'm not going anywhere." I responded. And at that point he said "I've been wanting to say this to you for a long time.

You are not his father. You are just a sperm donor. Get the hell out of here."

P.A. claimed he told Rorick that he was going to get his cell phone to record Rorick saying those things. According to P.A., as he was walking to his bicycle to get his cell phone, P.A. heard Rorick say twice, "Get the F out of here."

{¶ 9} When P.A. arrived at his bicycle, he reached into a saddlebag and pulled out his cell phone. P.A. stated that Rorick had followed him to the bicycle and that he knocked P.A.'s arm again, sending P.A.'s cell phone to the ground. P.A. said that Jeanette then told Rorick to go wait in the car, and Rorick did.

### *Rorick's Testimony*

{¶ 10} Rorick testified that he did not initially approach P.A. until the child had already gone to his mother and P.A. was standing by himself. He denied telling P.A. to get the hell out of there, testifying that he instead said, "It would be better if you left because [the child] does not want to play while you are here." Rorick agreed that P.A. refused to leave and claimed he had the right to be there because he was the child's father. Rorick also agreed that he called P.A. a sperm donor, testifying that he said, "I've been wanting to tell you this for a while… you are not a father. You are a sperm donor."

{¶ 11} Rorick stated that he did follow P.A. to his bike and he did knock P.A.'s phone down. But he explained that he was concerned P.A. was reaching for a weapon.

After knocking the cell phone down, Rorick said he turned and walked to his car. Rorick testified that he never touched P.A. or threatened to harm him during this incident.

## C. Following the Incidents

{¶ 12} Immediately after the second incident, P.A. went to the Wauseon Police Department to report Rorick's conduct. The Wauseon Police Department did not take a report, so P.A. went to the Fulton County Sheriff's Department, who did take a report.

{¶ 13} Following the two incidents, P.A. testified that he was fearful for his safety, and he had changed his behavior by staying home at night, scanning parking lots for Rorick, turning on his home alarm system, and locking his doors regularly when he had only irregularly done so beforehand.

{¶ 14} After the hearing, both parties issued proposed findings of fact and conclusions of law. On October 28, 2022, the magistrate issued a civil stalking protection order, finding by a preponderance of evidence that Rorick knowingly engaged in a pattern of conduct that caused P.A. to believe that Rorick will cause physical harm or cause or has caused mental distress. Rorick filed objections to the magistrate's order. Thereafter, the trial court issued its own findings and adopted the magistrate's issuance of the CSPO.

## II. Assignment of Error

{¶ 15} Rorick appeals the issuance of the CSPO, asserting the following assignment of error:

6.

The trial court erred in overruling appellant's objections and upholding the issuance of the civil stalking protection order.

### III. Law and Analysis

{¶ 16} In support of his assignment of error, Rorick makes two arguments.

(1) There was no competent, credible evidence to support the trial court's finding that Appellant engaged in a pattern of conduct.

(2) There was no competent credible evidence to support the trial court's finding that Appellant knowingly caused Appellee to belie[ve] he would cause him physical harm or mental distress.

{¶ 17} Rorick contends that the two incidents were isolated and not a pattern of conduct because the incidents occurred approximately seven months apart and nothing connects the incidents besides the parties' relationship. Next, Rorick argues that P.A. did not establish he had suffered mental distress, claiming that P.A.'s testimony that he is now more conscious of locking his doors and setting his alarms is insufficient to establish mental distress.

{¶ 18} To obtain a CSPO, a petitioner must prove "by a preponderance of the evidence that the person against whom the order is directed engaged in behavior that constituted menacing by stalking against the petitioner." *Martin v. Popson*, 6th Dist. Ottawa No. OT-12-036, 2013-Ohio-3956, ¶ 6; *see also Welborn-Harlow v. Fuller*, 6th

7.

Dist. Wood No. WD-11-013, 2013-Ohio-54, ¶ 22, citing *Striff v. Striff*, 6th Dist. Wood No. WD-02-031, 2003-Ohio-794, ¶ 10.

{¶ 19} Under R.C. 2903.211(A)(1), the menacing by stalking statute, "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person * * * or cause mental distress to the other person * * *."

{¶ 20} Ohio appellate courts have applied different standards of review to appeals involving CSPOs. Some courts have used an abuse-of-discretion standard to review appeals involving the issuances of a CSPO. *See, e.g., Collins v. Vulic*, 10th Dist. Franklin No. 20AP-528, 2021-Ohio-3343, ¶ 14 (applying an abuse-of-discretion standard of review to the issuance of a CSPO); *Johnson v. Miller*, 2d Dist. Miami No. 2017-CA-18, 2018-Ohio-2113, ¶ 15 (using an abuse-of-discretion standard to review a trial court's issuance of a CSPO). Others have used a manifest-weight standard of review. *See, e.g., Barium & Chems., Inc. v. Miller*, 7th Dist. Jefferson No. 14 JE 0030, 2016-Ohio-5656, ¶ 22. Still others have used a bifurcated standard, reviewing an appeal regarding the issuance of the CSPO using manifest weight and an appeal involving the terms of the CSPO using abuse of discretion. *See, e.g., Abuhamda-Sliman v. Sliman*, 8th Dist. Cuyahoga No. 85174, 161 Ohio App.3d 541, 2005-Ohio-2836, 831 N.E.2d 453, ¶ 9.

{¶ 21} In an earlier decision, this court expressly adopted a bifurcated standard of review for CSPO appeals. *Gruber v. Hart*, 6th Dist. Ottawa No. OT-06-011, 2007-Ohio-

8.

873, ¶ 17. In later cases, this court solely applied a manifest-weight approach, used the bifurcated approach, and also applied an abuse-of-discretion standard of review to CSPO appeals. *See, e.g., Krzystan v. Bauer*, 6th Dist. Ottawa No. OT-15-039, 2017-Ohio-858, ¶¶ 12-13 (applying manifest weight to the issuance of a CSPO); *Smith v. Strong*, 6th Dist. Lucas No. L-17-1058, 2017-Ohio-6918, ¶ 16 (explaining that a manifest-weight standard of review applied because the appeal involved the issuance of a CSPO rather than its terms); *Johnson v. Komisarek*, 6th Dist. Lucas No. L-16-1040, 2017-Ohio-2580, ¶ 9 (applying an abuse-of-discretion standard of review to the issuance of a domestic violence civil protection order). Because a petitioner must establish by a preponderance of the evidence that the respondent committed menacing by stalking for a court to issue a CSPO, we reaffirm that an appellate court should apply a manifest weight standard of review to appeals involving the issuance of a CSPO. *See Felton v. Felton*, 79 Ohio St.3d 34, 43, 679 N.E.2d 672 (1997) (reviewing the issuance of a domestic violence protection order to determine whether competent, credible evidence supported a finding that the petitioner was in danger of domestic violence).

{¶ 22} Under a manifest-weight standard of review, an appellate court "will not reverse the trial court's decision if it is supported by some competent, credible evidence going to all the essential elements of the case." *Strong* at ¶ 16, citing *Edwards v. Reser*, 6th Dist. Ottawa No. OT-07-022, 2007-Ohio-6520, ¶ 25. "Further, on appeal, we presume the validity of the trial court's factual findings because the trial court is in the

9.

best position to observe the witnesses and weigh the credibility of the proffered testimony." *Id.*, citing *Edwards v. Reser*, 6th Dist. Ottawa No. OT-07-022, 2007-Ohio-6520, ¶ 25.

{¶ 23} Rorick argues that no credible, competent evidence existed to establish two elements of menacing by stalking: pattern of conduct and mental distress.

## A. Pattern of Conduct

{¶ 24} A "pattern of conduct" is "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents." R.C. 2903.211(D)(1). Because the statute does not define closely related in time, "the temporal period within which the two or more actions or incidents must occur * * * [is a] matter to be determined by the trier of fact on a case-by-case basis." *Ellet* at ¶ 22. Further, the actions must be considered as a whole, and they may constitute a pattern of conduct "even if * * * some of the person's actions may not, in isolation, seem particularly threatening." *Ensley v. Glover*, 6th Dist. Lucas No. L-11-1026, 2012-Ohio-4487, ¶ 10, quoting *Guthrie v. Long*, 10th Dist. Franklin No. 04AP-913, 2005-Ohio-1541, ¶ 12. Incidents that occur several months apart may be sufficiently close in time to support a CSPO. *Kranek v. Richards*, 7th Dist. Jefferson No. 11 JE 2, 2011-Ohio-6374, ¶ 24.

10.

{¶ 25} An appellate court must defer to the trial court's assessments of credibility and determination of whether incidents are sufficiently closely related in time to constitute a pattern of conduct, as the trial court did in this case. *See Ellet* at ¶ 22.

{¶ 26} The CSPO is based on two incidents that occurred approximately seven and a half months apart and that were the only two interactions between the parties during the time period at issue. During the first incident on January 3, 2022, Rorick confronted P.A. during a tour of the children's future school and told P.A. to leave, that he should not be there, and that he had abandoned or sold his children. Rorick's son, Christopher, had to put his hand on RORICK and tell him to calm down before the confrontation ended.

{¶ 27} The second incident occurred on August 17, 2022 at one of P.A. and Jeanette's children's flag football practices. Upon arriving at practice, the child became upset when he saw that P.A. was there. P.A. stated that he attempted to comfort the child but that Rorick knocked his arm away, told P.A. "to get the hell out of here" and that he had no right to be there. When P.A. went to retrieve his cell phone from the saddlebag on his bicycle, P.A. said that Rorick told him to "Get the F out of here" and knocked P.A.'s arm causing the cell phone to fall on the ground.

{¶ 28} Based on the foregoing, competent, credible evidence supports the trial court's finding that the two incidents were closely related in time to establish that a pattern of conduct existed.

## B. Mental Distress

{¶ 29} "Mental distress" means "any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services." R.C. 2903.211(D)(2)(b). Establishing mental distress "does not require that the victim actually experience mental distress, but only that the victim believes the stalker would cause mental distress or physical harm." *Welborn-Harlow* at ¶ 26, quoting *Bloom v. Macbeth*, 5th Dist. Ashland No. 2007-COA-050, 2008-Ohio-4564, ¶ 11.

{¶ 30} No expert testimony is required to establish mental distress, and a victim's own testimony is sufficient. *Palmer v. Abraham*, 6th Dist. Ottawa No. OT-12-029, 2013-Ohio-3062, ¶¶ 16-18. The alleged stalker need not make a direct threat. *Id*. Mental distress can be demonstrated by a victim's testimony regarding a change in routine. *See, e.g., P.N. v. A.M.*, 7th Dist. Mahoning No. 20 MA 0033, 2021-Ohio-1163, ¶ 44 (holding that mental distress was established when the victim limited the use of backyard to avoid the alleged stalker); *Morton v. Pyles*, 7th Dist. Mahoning No. 11 MA 124, 2012-Ohio-5343, ¶ 24 (explaining that a change in the victim's work route, meal times, or exercise times to avoid the alleged stalker was sufficient to establish mental distress).

{¶ 31} Here, P.A. testified regarding his mental distress. Both interactions involved Rorick's confrontation of P.A in which Rorick intended to make P.A. leave his

12.

children's presence. P.A. testified that he felt fearful of Rorick and changed his behavior following the incidents by staying home at night, scanning parking lots for Rorick, setting his alarm, and locking his doors, which is enough to establish mental distress. Thus, there is competent, credible evidence to support the trial court's finding supported a finding that P.A. suffered mental distress as a result of the incidents involving Rorick.

## IV. Conclusion

{¶ 32} The trial court's issuance of the CSPO was not against the manifest weight of the evidence and therefore both of Rorick's assignments of error are found not well-taken. Accordingly, the judgment of the Fulton County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.


A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Christine E. Mayle, J.                                     _____
JUDGE

Gene A. Zmuda, J.

                                    _____
Charles E. Sulek, J.                                     JUDGE
CONCUR.

                                    _____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.