# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MAHONING COUNTY

P.N.,

Petitioner-Appellee,

v.

A.M.,

Respondent-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 20 MA 0033**

---

Civil Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 19 CV 1979

**BEFORE:**
David A. D'Apolito, Gene Donofrio, Cheryl L. Waite, Judges.

---

**JUDGMENT:**
Affirmed.

---

P.N., *Pro Se,* 2163 Gregory Avenue, Youngstown, Ohio 44511, Petitioner-Appellee (No Brief Filed) and

*Atty. James Lanzo,* 4126 Youngstown-Poland Road, Youngstown, Ohio 44514, for Respondent-Appellant.

Dated:  March 26, 2021

_____

**D'Apolito, J.**

{¶1}    Appellant, A.M. appeals the judgment entry of the Mahoning County Court of Common Pleas adopting the issuance by the magistrate of a civil stalking protection order ("CSPO") against her and in favor of Petitioner-Appellee, P.N.  For the following reasons, the judgment of the trial court is affirmed.

{¶2}    P.N. filed the petition for CSPO on September 30, 2019.   An ex parte hearing was conducted by the magistrate on October 1, 2019, and P.N.'s request for CSPO was denied.  A full hearing was held before the magistrate on October 15, 2019, and the magistrate granted the CSPO on that same day through October 15, 2024.

## JURISDICTION

{¶3}    As an initial matter, Civ.R. 65.1, captioned "Civil Protection Orders," specifically states that "[a] magistrate's denial or granting of a protection order after full hearing under this division does not constitute a judgment or interim order under Civ.R. 53(D)(4)(e) and is not subject to the requirements of that rule."   Ohio Civ.R. 65.1(F)(3)(c)(iv).  Therefore, Civ.R. 53, captioned, "Magistrates," is inapplicable to civil protection orders.

{¶4}    Nonetheless, A.M. filed objections to the CSPO on October 25, 2019, pursuant to Civ R. 53(D)(3)(b), which authorizes a party to file written objections to a magistrate's decision within fourteen days of the filing of the decision.  The objections summarily state that the magistrate's decision was unreasonable and unlawful and was not supported by sufficient evidence.  The transcript of proceedings before the magistrate was filed on December 17, 2019.

{¶5}    In considering the objections to the magistrate's decision, the trial court, like A.M., applied subsections of Civ.R. 53.  For instance, the trial court found that there was no reason for an oral hearing on the issues presented in the objections pursuant to Civ.R. 53(4)(d).  Further, the trial court observed that "Civil Rule 53(D)(3)(b)(ii) requires an objection to a Magistrate's Decision shall be specific and state with particularity all

Case No. 20 MA 0033

grounds for objection. Respondent did not make specific objections and did not state with particularity the grounds for the objections." (2/19/20 J.E., p 1.)

{¶6} Despite the lack of specificity in the objections, the trial court warranted that it had "undertaken an independent review as to the objected matters and finds that the Magistrate properly determined the factual issues and appropriately applied the law in consideration of this matter and finds no error of law or fact or other defect." (*Id.*) A.M. did not file objections to the judgment entry of the trial court adopting the CSPO.

{¶7} Civ.R. 65.1(G) provides, in its entirety:

Notwithstanding the provisions of any other rule, an order entered by the court under division (F)(3)(c) or division (F)(3)(e) of this rule is a final appealable order. However, a party must timely file objections to such an order under division (F)(3)(d) of this rule prior to filing an appeal, and the timely filing of such objections shall stay the running of the time for appeal until the filing of the court's ruling on the objections.

{¶8} A party filing objections under Civ.R. 65.1(F)(3)(d)(iii) "has the burden of showing that an error of law or other defect is evident on the face of the order, or that the credible evidence of record is insufficient to support the granting or denial of the protection order, or that the magistrate abused the magistrate's discretion in including or failing to include specific terms in the protection order." Despite the trial court's references to Civ.R. 53, the judgment entry on appeal reflects that the trial court applied the Civ.R. 65.1 standard of review.

{¶9} We have previously recognized that Civ.R. 65.1(G) does not provide for an objection to the magistrate's decision as in Civ.R. 53, but rather, it provides for an objection to the trial court's decision adopting the magistrate's decision. *J.S. v. D.E.,* 7th Dist. Mahoning No. 17 MA 0032, 2017-Ohio-7507, ¶ 15. Here, P.N. filed objections to the magistrate's decision issuing the CSPO pursuant to Civ.R. 53(4)(d), rather than the trial court's adoption of the CSPO pursuant to Civ.R. 65.1(G).

{¶10} We have also previously recognized that the filing of objections to the Civ.R. 65.1(F)(3)(c) adoption, modification, or rejection by the trial court is jurisdictional. *Id.* at ¶ 21 ("Where a civil protection order is issued by a magistrate and made effective due to

adoption by the trial court under Civ.R. 65.1(F)(3)(c), the alternative of immediately appealing the protection order without filing timely objections is no longer available after the July 1, 2016 amendments to the rule."); *K.U. v. M.S.*, 7th Dist. Mahoning No. 16 MA 0165, 2017-Ohio-8029, ¶ 18 (dismissing appeal for lack of jurisdiction); *J.K. v. T.J.*, 7th Dist. Mahoning No. 17 MA 0002, 2017-Ohio-9239, ¶ 7 (same). In other words, we have held that, in the absence of timely-filed objections pursuant to Civ.R. 65.1(G), we lack jurisdiction to hear this case. It should be noted, that in this case objections were filed, albeit prematurely and under a different civil rule.

**{¶11}** However, A.M.'s error had no practical effect, as the trial court considered the matter under the proper standard and a transcript of the proceedings had been filed prior to the trial court's review of the CSPO. Further, the legislative history of the civil rule establishes that the intent behind the amendment to Civ.R. 65.1(G) in 2016 has been fulfilled in this case. According to the staff notes:

> Division (G) of this rule is amended to require that a party must file objections prior to filing an appeal from a trial court's otherwise appealable adoption, modification, or rejection of a magistrate's ruling. This amendment is grounded on two key principles. First, it promotes the fair administration of justice, including affording the trial court an opportunity to review the transcript and address any insufficiency of evidence or abuse of discretion that would render the order or a term of the order unjust. Second, it creates a more robust record upon which the appeal may proceed.

Acordingly, we find that we have jurisdiction to consider the above-captioned appeal.

### **FACTS**

**{¶12}** P.N., P.N.'s son, J.P., who lives with P.N., and A.M. testified at the hearing before the magistrate on October 15, 2019. The following facts are taken from the hearing testimony. The respective ages of the parties are not in the record.

**{¶13}** P.N. and A.M. are backyard neighbors. A.M.'s residence is to the right of the residence directly behind P.N.'s residence. P.N. and A.M. both testified that they do not know each other.

{¶14} Both properties are enclosed with fencing. P.N.'s backyard is enclosed by a chain link fence, and A.M.'s backyard is enclosed by a stockade fence. A "stockade fence" is defined as "a solid fence of half round boards pointed at the top."

{¶15} According to A.M., prior to the installation of the stockade fence, P.N. regularly sat on her back porch smoking cigarettes and "yelling over calling [A.M.] names [including] [g]orilla and the 'B' word a lot." (10/15/19 Hrg. Tr., p. 24.) A.M. also recounted an occasion when she was talking on the phone with a friend, and P.N. yelled "Why don't you shut the - the "F" word." (*Id.*) A.M. had no explanation for P.N.'s behavior prior to the installation of the stockade fence.

{¶16} A.M. explained that she installed the stockade fence because P.N.'s dog barked whenever A.M. exited her residence through her back door. According to A.M., the installation of the stockade fence two years prior to the hearing intensified P.N.'s ill-will toward A.M. When A.M. was asked by the trial court if P.N. ever complained about the stockade fence, A.M. responded:

> Oh, yes. Well, the contractor didn't even get up the street after they pulled out of my driveway; and they went into their house, and they went up in their upstairs part of their house and opened a window. And she had her son rope [sic] – a rope around these tree limbs that all was blocking the view from my lawn from my backyard and pull them down because it upset them, obviously, that I put that stockade fence up to have my privacy.

(*Id.* at p. 21.)

{¶17} A.M. further testified that, roughly one month before the hearing, P.N. and J.P. had "cut these trees down, and they was burning these trees instead of having them chopped up like normal people." (*Id.* at p. 28.) According to A.M., the smoke from the fire filled her home and caused her eyes to burn, so she called the fire department. A.M. attributed the accusations giving rise to the petition in this case to P.N.'s anger regarding A.M.'s call to the fire department.

{¶18} Roughly four weeks prior to the hearing, P.N. installed a treehouse in her backyard. The treehouse abuts the two fences.

**{¶19}** On September 27, 2019, P.N. and her four-and-a-half -year-old grandson were having lunch in the treehouse, when P.N. saw A.M. in A.M.'s backyard. According to P.N., A.M. said, "Hey, little boy. Hey, little boy, come here. Do you want to see my kitty? Do you want to look at my kitty?" P.N. testified that A.M. was gesturing to her vagina.

**{¶20}** P.N. shielded her grandson's eyes, and instructed him to exit the treehouse and return to the residence. P.N. followed and told her husband to call the police. The police filed a report of the incident.

**{¶21}** J.P. testified that his son was eager to show J.P. the treehouse when J.P. returned home from work later that same day. After dinner, J.P. and his son climbed into the treehouse. According to J.P., A.M., who was in her backyard, said, "Hey, little boy, watch me shake my butt." (*Id.* at p. 15.) According to J.P., music was playing, and A.M. clearly said, "[h]ey, little boy," and "turned to shake her butt at [J.P.]'s son." (*Id.*) P.N. called the police again in order to report A.M.'s behavior.

**{¶22}** P.N. and J.P. testified that A.M. engaged in similar conduct during a family cookout in P.N.'s backyard on September 29, 2019. P.N. testified that A.M., who was standing in her own backyard, "was yelling at [P.N.'s] grandkids [two grandsons and a granddaughter] asking them if they wanted to watch [A.M.] play with her clit." (*Id.* at p. 10.) J.P. likewise testified that A.M. "started screaming incoherent nonsense," then said, "[h]ey, little boy watch how I rub my clit. Let me show you how I rub my clit." (*Id.* at p. 17.) P.N. called the police a third time.

**{¶23}** J.P. testified that when A.M. began shouting, he thought, "oh, she's doing it again, because ever since [J.P.] came to visit [his parents] for over two years now [A.M.] had done this." (*Id.* at p. 16.) He further testified that A.M. has been yelling at him and his family members for years whenever they sat outside to smoke cigarettes.

**{¶24}** P.N. testified that she and her then-boyfriend/now-husband had one conversation with A.M. more than two years prior to the incidents giving rise to the petition. The magistrate asked P.N. if A.M. had ever threatened her, and P.N. responded "Yes. She said she was going to beat my effin ass, you effin cunt. That was about a year and a half ago." (*Id.* at p. 11.)

**{¶25}** Next, the magistrate asked P.N. if she had modified her behavior as a result of A.M.'s conduct, and P.N. responded, "No. The last time you suggested that not [sic] take my grandson out there. * * * But it's his backyard, and I try to do it when she is not out there." (*Id.* at p. 12.) The magistrate responded, "Okay. So you did modify your behavior because of that, what she said to you?" P.N. responded, "Yes." (*Id.*)

**{¶26}** Finally, the magistrate asked P.N. if her grandson had commented about the incidents with A.M. P.N. responded, "No. just if he had to see the mean lady, and the mean lady wasn't out, we would go out [sic]." (*Id.* at p. 12-13.)

**{¶27}** The magistrate asked A.M. why she never reported the various incidents of name calling by P.N. to the police, as A.M.'s testimony established that the P.N.'s ill-mannered and unprovoked comments dated back many years. A.M. replied that, in retrospect, she regretted not making a record of P.N.'s conduct since the accusations in the petition were patently untrue. A.M. averred, "I swear to God on my life. Let a train run over me." (*Id.* at p. 23, 25.) She testified that she was "flabbergasted" by the accusations, and that "[her heart] heart dropped to the ground." (*Id.* at p. 19-20.)

**{¶28}** A.M. further testified that "when the police came to [her] house [to investigate P.N.'s accusations], [A.M.] asked if they could help [her] do something about it [sic] because now [P.N. and J.P.] got the floodlight shining in the back of [A.M.'s] window of [her house.]" (*Id.* at p. 26.) When the officers told A.M. that they were investigating a report that there were problems between P.N. and A.M., A.M. conceded that her response was, "not that I know of." (*Id.* at p. 27.) The magistrate asked A.M. why she did not report the ongoing name calling and the fire to the officers when they questioned her about the alleged problems, and she responded, "[w]ell I just told them about the floodlight being on in the back of my house."

**{¶29}** Next, the magistrate asked A.M. if she brought any witnesses to the hearing to testify on her behalf, and she replied, "No, because I didn't even know what I was here for I really didn't." (*Id.* at p. 30.) The magistrate asked A.M. if the officers had given her papers when they visited her house. A.M. testified that, although she received the papers from the officers, she did not read them because she assumed that the papers described the ongoing dispute over P.N.'s dog.

**{¶30}** The magistrate told A.M., "instead of assuming, you should have read [them] * * * that's what a reasonable person would do in your position, read the papers that the police bring to your house." A.M. replied, "I was just under a lot of stress at the time." (*Id.* at p. 30.)

**{¶31}** After returning to her seat in the gallery, A.M. blurted out, "I'm flabbergasted." The magistrate responded, "You told me that." A.M. replied, "I should have known to read the papers." (*Id.* at p. 33.)

## ASSIGNMENT OF ERROR

**THE TRIAL COURT'S GRANTING OF A CIVIL STALKING PROTECTION ORDER TO THE PETITIONER-APPELLEE HEREIN IS VOID INASMUCH AS THE TRIAL COURT ERRED IN FINDING A VIOLATION PURSUANT TO R.C. 2903.211 UNDER R.C. 2903.214(C)(1).**

**{¶32}** Appellee did not file a brief. App.R. 18(C) states: "If an appellee fails to file the appellee's brief within the time provided by this rule * * * the court may accept the appellant's statement of the facts and issues as correct and reverse the judgment if appellant's brief reasonably appears to sustain such action."

**{¶33}** The decision whether to grant a civil protection order lies within the sound discretion of the trial court. *Masucci v. Burnbrier*, 7th Dist. Mahoning No. 14 MA 78, 2015-Ohio-4102, ¶ 9. An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶34}** The standard of review for whether the protection order should have been granted, and, thus, whether the elements of menacing by stalking were established by the preponderance of the evidence, entails a manifest weight of the evidence review. *Caban v. Ransome*, 7th Dist. Mahoning No. 08MA36, 2009–Ohio–1034, ¶ 7. The Ohio Supreme Court has explained that the manifest weight of the evidence standard set forth in *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), a criminal case, also applies in civil cases. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶ 17–23. As explained in *Thompkins*:

> The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*Thompkins, supra*, at 387. However, in weighing the evidence, "the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley* at ¶ 21.

**{¶35}** A menacing by stalking civil protection order requires an allegation that the respondent committed a violation of R.C. 2903.211. R.C. 2903.214(C)(1). R.C. 2903.211(A)(1) provides:

> No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person.

**{¶36}** As used in R.C. 2903.211, a pattern of conduct means "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents." R.C. 2903.211(D)(1). The subsection does not require that a pattern of conduct be proven by events from two different days. *Morton v. Pyles*, 7th Dist. Mahoning No. 11 MA 124, 2012-Ohio-5343, ¶ 13, citing *Halton v. Crossley*, 5th Dist. Coshocton Nos. 11 CA10 and 11 CA11, 2012–Ohio-550, ¶ 42. Rather, a pattern of conduct can arise out of two or more events occurring on the same date, provided that there are sufficient intervals between them. *Id.* The statute does not define the term "closely related in time," but case law suggests that the evidence should be considered in context, that is, on a case-by-case basis. *Id*.

**{¶37}** A person acts "knowingly" when that person is aware that his or her conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B). "Mental distress" means any of the following:

(a) Any mental illness or condition that involves some temporary substantial incapacity;

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

R.C. 2903.211(D)(2).

**{¶38}** Mere mental stress or annoyance does not constitute mental distress for purposes of the menacing by stalking statute. *Caban v. Ransome*, 7th Dist. Mahoning No. 08MA36, 2009-Ohio-1034, ¶ 29. The statute does not, however, require that the mental distress be totally or permanently incapacitating or debilitating, rather it merely has to be substantial. *Id.*

**{¶39}** Decisions regarding credibility fall within the province of the trier of fact. *D.R.B. by K.G.B. v. G.T.B.*, 7th Dist. Noble No. 17 NO 0452, 2018-Ohio-2787, ¶ 14. The trier of fact has the best opportunity to view the demeanor, attitude, and credibility of each witness, which items do not translate well on the written page. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418-419, 674 N.E.2d 1159 (1997), citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80-81, 461 N.E.2d 1273 (1984).

**{¶40}** A.M. does not challenge the magistrate's credibility determination, but, instead, argues that "[she] never made any threats of violence and only allegedly made inappropriate remarks to [P.N.'s] grandson." (Appellant's Brf., p. 2.) A.M. further argues that "[P.N.] testified to not modifying her behavior." (*Id.* at p. 3.) Finally, A.M. argues that [P.N.] does admit to spending less time in her backyard, however, none of her actions following the alleged offenses could be considered a ' . . . substantial incapacity.'" (*Id.* at p. 4.)

**{¶41}** We have previously recognized that incapacity is substantial if it has a significant impact upon the victim's daily life. *Morton, supra,* at ¶ 15, citing *Retterer v. Little*, 3d Dist. No. 9-11-23, 2012-Ohio-131, ¶ 41. In *Morton*, supra, we observed in *dicta* that "[a] change in routine has been stated to constitute a showing of mental distress

\* \* \* a change of routine suggests going to work a different route to avoid contact with the stalker or to change a lunch time or exercise time." *Morton*, supra, at ¶ 24.

{¶42} The record reflects that P.N. and J.P. often smoke cigarettes in the backyard of P.N.'s residence. Further, the installation of the treehouse for P.N.'s grandson increased the overall use of the backyard.

{¶43} While P.N. initially denied altering her routine, she ultimately testified that, following the events giving rise to the petition, she and her grandson only use the backyard when A.M. is not in her backyard. P.N. further testified that, although her grandson did not comprehend A.M.'s obscene comments, he is nonetheless aware of the problems between the neighbors and referred to A.M. as "the mean lady."

{¶44} The trial court credited the testimony of P.N. and J.P. that the use of P.N.'s backyard was limited due to A.M.'s outbursts. We find that limited use of one's own backyard falls within the ambit of phrase "substantial incapacity," as that phrase has been previously interpreted. As a consequence, we find that A.M.'s sole assignment of error, predicated upon the argument that a violation of R.C. 2903.211 is not borne out by the record, has no merit.

## CONCLUSION

{¶45} For the foregoing reasons, the judgment of the trial court is affirmed.

Donofrio, P.J., concurs.

Waite,.J., concurs.

Case No. 20 MA 0033

[Cite as *P.N. v. A.M.*, 2021-Ohio-1163.]

_____

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**