[Cite as *A.B. v. I.E.*, 2024-Ohio-1809.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

A.B.

    Appellee

v.

I.E.

    Appellant

Court of Appeals No.  WD-23-018

Trial Court No.  2023 DV 0007

**<u>DECISION AND JUDGMENT</u>**

Decided:    May 10, 2024

* * * * *

Nicole Cote and Laurel A. Kendall, for appellee.

I.E., pro se, appellant.

* * * * *

**OSOWIK, J.**

**{¶ 1}** This is an appeal of a March 28, 2023 judgment of the Wood County Court of Common Pleas, granting a civil protection order, pursuant to R.C. 3113.31, to appellee and her infant son.  For the reasons set forth below, this court affirms the judgment of the trial court.

{¶ 2} Appellant, I.E., father of the minor child, sets forth the following assignment of error:

"I, I.E., [appellant] am appealing the decision * * * due to Magistrate M.C.'s errors during [the] CPO trial held on March 20, 2023 []."

{¶ 3} The following undisputed facts are relevant to this appeal. In March, 2021, appellee, then a resident of Oak Harbor, Ohio, met appellant on an online dating application. Appellant, a physician, was employed at a hospital in Detroit and resided in suburban Detroit. The parties initially communicated online, then subsequently began an in-person relationship. The record shows that the relationship was tumultuous.

{¶ 4} In October, 2021, approximately six months after the parties met, appellee relocated to Michigan and moved in with appellant. Shortly thereafter, appellee became pregnant. Upon learning of appellee's pregnancy, appellant denied paternity, accused appellee of infidelity, and the parties ceased cohabitation. Appellee denied that she had been unfaithful. An in-vitro DNA paternity test, performed at appellant's request, confirmed appellant's paternity of appellee's unborn child. Following the DNA confirmation of appellant's paternity, the parties resumed cohabitation. On July 24, 2022, a son was born to the parties.

{¶ 5} After the birth of their son, the strained relationship between the parties further deteriorated, appellant's conduct became increasingly erratic, and a series of precarious incidents began to occur.

{¶ 6} On the day of the baby shower for their newborn son, appellant's parents, who the record shows to be unabashed in their dislike of appellee, became highly agitated

2.

that appellee was untimely in her arrival. Appellee had been delayed upon encountering heavy traffic congestion due to a traffic accident. When she arrived, appellee was met with yelling and aggression from both appellant and his parents. When she attempted to explain the cause of her late arrival, the hostilities escalated. Just prior to her decision to leave, appellant began screaming at appellee to, "Just get the fuck out."

{¶ 7} On October 28, 2022, appellant and appellee planned a getaway weekend to Cuyahoga Falls. However, appellant mistakenly left needed items, including his wallet, at the hospital in Detroit, which then had to be retrieved, delaying their departure. This triggered extreme anger on the part of appellant. Appellee reassured appellant that it was fine and they would embark on the trip when he returned from Detroit, but her efforts to diffuse the situation were to no avail.

{¶ 8} While later traveling on the Ohio turnpike en route to Cuyahoga Falls, appellant became combative towards appellee, drove the vehicle to the side of the turnpike, grabbed appellee's arm, forcibly removed her mobile phone, and threatened to eject her from the vehicle along the turnpike. During the chaos of this incident, their infant son began crying in the backseat. In response, appellant scolded appellee that her "punishment" would be that appellant would not permit her to soothe or nurse the baby. Rather, appellant demanded that appellee sit silently and do nothing while the baby cried.

{¶ 9} In November, 2022, the parties traveled to the Dominican Republic to attend the wedding of appellant's brother. During an altercation in their hotel room, which occurred after the parties attempted to be intimate, but were unsuccessful as an apparent result of appellant's copious consumption of alcohol, appellant began screaming at

3.

appellee, confiscated her passport, her driver's license, and threatened to eject appellee from their hotel room despite her being in a state of total undress. This ruckus continued for several hours before subsiding.

{¶ 10} On January 12, 2023, while appellee was breast feeding their infant son, appellant became belligerent. Appellant inexplicably accused appellee of being a trespasser in their residence, threatened to throw her out of the residence, told her to go back to Ohio, and disparagingly referred to her as a, "a single mother." On the morning of January 13, 2023, appellee packed up their infant son, her cat, and her possessions, and moved to her parents' home in Perrysburg, Ohio.

{¶ 11} After realizing that appellee had gone, appellant sent dozens of frantic text messages to her, exclaiming, "Please call me * * * For fucks sake * * * For the love of God * * * I'm going to have a heart attack * * * I can't live without you * * * I'm about to get in a car accident. I can't breathe * * * I fucked up * * * Please forgive me * * * I got in a car accident. I'm hurt bad." Appellee did not respond. The record shows that appellant was not in a car accident and was not injured.

{¶ 12} On January 14, 2023, the day after appellee left, appellant travelled from Michigan to the Perrysburg home of appellee's parents. Appellant pounded repeatedly upon the door, yelling and demanding to speak with appellee. In an effort to calm the situation, appellee's father went outside and spoke with appellant for approximately 45 minutes. Despite these efforts, appellant continued to refuse to leave and, ultimately, the Perrysburg Police Department were dispatched to the scene and ordered him to leave.

4.

{¶ 13} Upon the end of their relationship, allegations began to be made against appellee and her parents. Complaints were made accusing appellee of fraud and misconduct in connection to certain government benefit programs. An investigation revealed no improprieties and found the complaints to be baseless. In addition, complaints were made against appellee and her parents, alleging child abuse against the parties' infant son. An investigation by Wood County Children's Services found the abuse allegations to be baseless. The matter was closed. Appellant does not deny triggering these investigations.

{¶ 14} Given appellant's pattern of volatility and hostility towards appellee, including multiple incidents occurring in the presence of their infant son, on January 17, 2023, appellee filed a request for a civil protection order for appellant, applicable to herself and their infant son, pursuant to R.C. 3113.31. On March 20, 2023, the trial court conducted an evidentiary hearing to consider the request.

{¶ 15} While testifying at the hearing regarding the above-discussed October 28, 2022 incident during the trip to Cuyahoga Falls, appellee explained,

> [S]hortly after arriving he realized he left his bookbag at work * * * and his
> wallet was in his bookbag, so we had to get it [before leaving for Cuyahoga
> Falls] * * * I said it was fine, but he was upset * * * I don't remember
> exactly what upset him the most, I don't know if it was the baby crying or
> what, but about a few hours into the ride he threatened to kick me out, and
> he was yelling. He said he was going to pull the car over, and he did, on
> the turnpike, he pulled over. And he put the car in park. He took my phone

5.

out of my hands.  He leaned over and got the car door ajar, and was attempting to take my seat belt off.  With his other hand he had grabbed my left arm * * * and then he said for my punishment * * * I wasn't allowed to soothe the baby * * * That was my punishment, to sit there and listen to the baby [crying].

{¶ 16} Appellee made an audio recording of the incident, which was then played for the trial court.

{¶ 17} In next testifying regarding the November, 2022 Dominican Republic incident, appellee explained, "[H]e started to get very upset and rage and yell and throw things and call me names, and cornered me and wouldn't let me move, and threatened to kick me out of the room.  And he took my passport, my license.  And all at the time I was naked * * * [This continued for] two and a-half hours, I don't know, maybe three hours.  It was a long time."  Appellee also made an audio recording of this incident, which was then played for the trial court.

{¶ 18} In next testifying regarding the final January 12, 2023 incident, which prompted appellee to move out of appellant's residence and return to Ohio, appellee stated,

He called me stupid, dumb * * * lazy * * * [H]e just didn't stop, still calling names * * * He called me a bitch, c**t, whore, slut, retarded, stupid, dumb * * * [H]e was tearing apart the master bedroom.  He ripped items away from me when [I was] breastfeeding the baby while threatening to kick me out * * * And he started throwing the blankets and pillows again

* * * And I had the baby, and he said to put the baby down. And I said, no. I was breast-feeding him * * * He started taking items from around the baby, like his diaper caddy. And he, like, took it across the room and said, you're getting out.

{¶ 19} The record shows that during his testimony to the trial court, appellant interacted with the trial court in a highly antagonistic fashion. Appellant continually declined to answer the questions posited to him by the trial court, and rather than respond to the question posed by the trial court to him, appellant would engage in lengthy diatribes against appellee, and against the trial court itself. The trial court finally advised appellant, "This is getting way too argumentative." Appellant persisted. Appellant then exclaimed to the trial court, "If you're suggesting that reporting somebody for fraud [which had been deemed to be baseless] is not correct, then that's very unethical. In fact, I told many of my friends all about her [appellee]." Again, all claims of malfeasance and misconduct made against appellee by appellant and his parents were investigated and uniformly found to be without merit. The trial court ultimately admonished appellant, "That's my last [warning] to you."

{¶ 20} Appellant's parents, who reside in Canada, next provided testimony. Just as appellant did throughout the proceedings, rather than acknowledge any impropriety or accountability on appellant's part, regardless of the recordings, appellant's father belittled appellee. Appellant's father stated, "[W]hat do you expect a guy [to do] -- she is not cooking, lazy, a hoarder person * * * How do you react? Do you yell or do you say, okay, okay, honey, do you continue? She was a hoarder. She was sending my son to the

7.

dumpster." Lastly, appellant's mother stated, "[M]y son was always loving * * * she [appellee] has mental issues." The parties rested.

{¶ 21} On March 28, 2023, the trial court granted appellee's request for a civil protection order pursuant to R.C. 3113.31. The protection order names the protected persons as appellee and her infant son. This appeal ensued.

{¶ 22} In the assignment of error, appellant alleges that the trial court erred in granting the civil protection order. We are not persuaded.

{¶ 23} R.C. 3113.31 governs protection orders concerning domestic violence. R.C. 3113.31(A)(1) establishes, in relevant part,

> Domestic violence means any of the following: (a) The occurrence of one or more of the following acts against a family or household member: (i) attempting to cause or recklessly causing bodily injury; (ii) placing another person by the threat of force and fear of imminent serious physical harm []; (iii) committing any act with respect to a child that would result in the child being an abused child[]. (b) the occurrence of one or more of the acts identified in divisions (A)(1)(a)(i) to (iv) of this section against a person with whom the respondent is or was in a dating relationship.

{¶ 24} In conjunction with the above, as held by this court in *Spaulding v. Spaulding*, 2021-Ohio-533, ¶ 10 (6th Dist.):

> When granting a protection order, the trial court must find that petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of domestic violence. R.C. 3113.31(D). *Felton v. Felton*, 79 Ohio St.3d 34, 679 N.E.2d 672 (1997), paragraph two of the syllabus. The decision to grant or dismiss a request

8.

for a civil protection order is within the discretion of the trial court. *Rangel v. Woodbury*, 6th Dist. Lucas No. L-09-1084, 2009-Ohio-4407, ¶ 11 * * * An appellate court will not reverse the trial court's decision regarding a civil protection order absent an abuse of discretion * * * An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983). *If the trial court's decision is supported by credible and competent evidence, the appellate court will not reverse the decision as an abuse of discretion. Rangel* at ¶ 11. (Emphasis added).

{¶ 25} In applying these governing legal parameters to this case, we find that the record encompasses considerable evidence, both testimonial evidence and collaborating audio recordings, showing that on multiple occasions appellant acted in an extremely erratic, aggressive, and threatening manner against appellee, and did so multiple times in the presence of their infant son. Appellant attempted to physically eject appellee from their motor vehicle on the side of the Ohio Turnpike and refused to permit appellee from comforting their crying, upset infant. Appellant confiscated appellee's passport, driver's license, and mobile phone while berating her in a hotel room in the Dominican Republic, and repeatedly threatened to eject her into the hotel hallway without identification while in a state of total undress, and did so for several hours. Lastly, appellant yelled at appellee inside of their Michigan residence and repeatedly ordered her to leave, while tossing about infant care items, and did so while appellee was breast feeding their infant son. In response, appellee and his parents attribute all blame upon appellee.

{¶ 26} We have reviewed and considered the record of evidence. We find that the record shows that the trial court's decision to grant the civil protection order for appellee and her infant son was supported by credible and competent evidence. Accordingly, in

9.

conformity with *Spaulding* and *Rangel*, the trial court did not err in granting it.
Wherefore, appellant's assignment of error is found not well-taken.

{¶ 27} On consideration whereof, the judgment of the Wood County Court of Common Pleas is hereby affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.      _____

                 JUDGE

Christine E. Mayle, J.      _____

Myron C. Duhart, J.         JUDGE
CONCUR.

               _____

                 JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

10.