[Cite as *J.F. v. Twining*, 2025-Ohio-5823.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

| | |
|---|---|
| J.F. | Court of Appeals No. L-25-00083 |
| Appellee | Trial Court No. DV020240598 |
| v. | |
| Chad Twining | **DECISION AND JUDGMENT** |
| Appellant | Decided: December 30, 2025 |

* * * * *

Stephen M. Szuch, Esq., for appellee.

Scott A. Ciolek, Esq., for appellant.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant, Chad Twining, appeals from the April 1, 2025 judgment of the Lucas County Court of Common Pleas, Division of Domestic Relations, adopting the magistrate's issuance of a domestic violence civil protection order (DVCPO) against him and in favor of J.F. For the following reasons, the trial court's judgment is affirmed.

## I. Background

{¶ 2} J.F. and Twining were previously married, and the two had a son and a daughter together. Following their divorce, J.F. married another person and Twining did as well. Although their divorce was finalized many years ago, J.F. and Twining were litigating issues regarding custody of their daughter when the events giving rise to the DVCPO occurred.

{¶ 3} On September 10, 2024, J.F. filed a petition for a DVCPO against Twining with the trial court. The court issued an ex parte DVCPO pending a hearing before a magistrate, which occurred on December 10, 2024. At the hearing, J.F., Twining, and Deputy Jeremy Leek with the Wood County Sheriff's Department each testified.

### A. J.F.'s Testimony

{¶ 4} J.F. and Twining were married for over a decade. J.F. testified that Twining was violent and physically and emotionally abusive to her and their children. Twining called her demeaning names, pushed her, and controlled the family's finances. He also called their children names. J.F. stated that Twining once threw their daughter into her crib by her arm and another time he picked up their son by his neck. In fits of anger, Twining ripped their kitchen faucet out and threw a kitchen chair through a wall. J.F. also testified that Twining killed their dog when it got in between him and their son when Twining was attempting to discipline their son. She said Twining kicked the dog so hard that the dog died. J.F. was afraid to press charges against him, and it took her many years to leave him. While they were married, Twining owned several guns.

2.

{¶ 5} On Saturday, August 17, 2024, approximately ten years after her divorce from Twining and over a year since she had last seen Twining, J.F., her husband, and her daughter were spending time in Marblehead, Ohio. The family has a travel trailer that they park in a development with RV lots. That evening, J.F. was sitting outside the family's trailer when she noticed a bright red Chevy pickup truck with dark rims in the parking lot of a boat sales business located next to the development, approximately 50 feet from where their trailer was parked. J.F. observed the red pickup truck driving slowly through the lot before parking. She noticed that although the truck remained parked for more than 30 minutes, no one ever got out of the vehicle. J.F. found that unusual because visitors to the boat sales lot typically get out of their vehicles to look at the boats. At that time, she did not see who was driving the truck.

{¶ 6} The next evening, J.F. saw the same red truck in the boat lot again, but the truck spent more time in the lot than the previous evening. She again saw the truck driving slowly through the lot before parking for 30 minutes or more at a time, leaving, and then returning. Again, no one ever emerged from the vehicle while it was parked. This time, unlike the previous evening, J.F. saw that Twining was driving the vehicle and he appeared to be watching her trailer.

{¶ 7} J.F. was especially upset about Twining watching her in Marblehead because although Twining was aware that she and her husband had a travel trailer, she did not believe Twining had any way to know where they parked it. J.F. explained that

3.

Twining had tracked her phone and her son's phone in the past and she was worried that he was somehow tracking her again.

{¶ 8} A week later, on Sunday, August 25, 2024, J.F. drove her daughter and her daughter's friend home to Sylvania, Ohio from Marblehead. Her daughter's friend lived in the subdivision next to J.F.'s subdivision. As J.F. pulled over in front of the friend's house, she noticed a dark Jeep drove past her. The road where the friend lived ended in a cul-de-sac, and the Jeep slowly passed J.F.'s vehicle, went around the cul-de-sac, and drove slowly past her again. J.F., who was only five to ten feet away from the Jeep, saw Twining driving the Jeep. Again, J.F. was very disturbed by this because Twining should not have any reason to know that she would be in the friend's neighborhood.

{¶ 9} J.F. testified that these incidents "gave [her] a lot of fear, mental distress." She explained, "I have this person that we have this history of violence, and I know about all of his guns." She testified that after the incidents, she changed her behavior, explaining as follows:

> I was constantly on alert. I'm always looking over my shoulder. I stopped taking … walks around my neighborhood in fear that he was following me and that something might happen that he would come after me. Any time I was at my lake, I was … looking over my shoulder for him. My daughter was freaked out. It just has affected my whole family …

In the few weeks after the third incident, J.F. searched for and consulted with a lawyer to find out what she could do about Twining's actions. She filed police reports about the incidents, and on September 10, 2024, she filed her petition for a DVCPO.

4.

{¶ 10} On September 21, 2024, after Twining had been served with an ex parte DVCPO, J.F., her husband, and daughter were in Marblehead again. That evening, sometime around 5:30 p.m., they were driving out of the development where their trailer was parked to get ice cream. As they were getting ready to turn onto the main road from the development, J.F. saw a maroon Honda SUV leave the marina next to the development onto the main road, attempt to turn into the development, and then veer away as if the driver suddenly decided not to turn. J.F. saw Twining in the passenger seat of the Honda, and she saw him "[make] a quick attempt to try to hide himself by pulling down the visor, a ball cap and ducking down." J.F. posited that Twining must not have expected to see her driving out of the development at that moment.

{¶ 11} J.F. believed that Twining may have also violated the DVCPO by misrepresenting his possession of firearms. J.F. discovered that when he was served with the ex parte order, Twining signed a statement asserting that he did not have any firearms in his possession. Because she knew that Twining owned several firearms during their marriage, she contacted the Wood County Sheriff's Department.

{¶ 12} During her testimony, J.F. acknowledged that Twining denied he had been in Marblehead or Sylvania on the dates she claimed to have seen him and that Twining planned to support his denial with Google Timelines and videos. J.F. did not believe that the Google Timelines and videos were reliable, explaining that Twining has significant technical knowledge, built computers, and wired houses. J.F. testified that during a quick

5.

Google search, she learned that dates, times, and locations on Google Timeline could be easily modified.

## B. Deputy Jeremy Leek's Testimony

{¶ 13} Deputy Jeremy Leek with the Wood County Sheriff's Department testified that Twining was served with the DVCPO at the sheriff's office on September 17, 2024. Because a respondent to a DVCPO must turn over firearms to the police for safekeeping, Twining was required to either arrange to turn over his firearms at that time or attest that he had none in his possession. Twining signed the form attesting that he had no weapons in his possession.

{¶ 14} About a week later, Deputy Leek took a call from J.F. She told Deputy Leek that she did not believe Twining's statement that he possessed no firearms, claiming that Twining had an "arsenal" of weapons at his home. Leek then went to Twining's home in Perrysburg, Ohio to investigate.

{¶ 15} Deputy Leek's encounter with Twining at his home was recorded by Leek's body-worn camera, and portions of the recording of that encounter were played during the hearing. Upon Leek's arrival, he explained to Twining that the ex parte DVCPO required Twining to turn over all firearms in his possession. Leek suggested that Twining may not have realized that requirement was not limited to firearms on Twining's person at the time he was served with the order and instead included any firearms in Twining's home. Twining denied having any firearms in his home and agreed to walk Deputy Leek around his home to show him that he had none.

6.

{¶ 16} The home's front room contained a large gun safe equipped to store several guns. Upon opening the gun safe, Twining asked Deputy Leek if he was allowed to have the muzzle loader that was located inside the safe. Leek confirmed that Twining could not possess that and informed Twining he would have to take the muzzle loader, which Leek described as "a hunter bolt magnum," for safekeeping. Twining then pulled out two .22 air rifles from the safe, and Deputy Leek again informed Twining that he could not possess them under the ex parte DVCPO, taking them for safekeeping as well.

{¶ 17} Another gun safe with the capacity to hold several guns was in a bedroom. Although that gun safe did not contain any firearms, Deputy Leek noticed a large storage container full of ammunition of varying kinds under the bed, which he also took for safekeeping.

{¶ 18} While Deputy Leek found no additional firearms, the presence in the home of "numerous safes and different bags and different things … led [him] to believe that [Twining] may be in possession of more firearms." Accordingly, Leek asked Twining where his other firearms were. Twining told Deputy Leek that he had given them to his brother, Steve. Leek asked Twining for Steve's phone number so that Deputy Leek could speak to him. In the video, as he was looking for Steve's phone number in his cell phone, Twining is heard telling Deputy Leek that he and his brother use "scramblers," which he maintained was legal. Leek testified that he was later able to call Steve, who told Deputy Leek that Twining had given him various "gun parts."

7.

## C. Twining's Testimony

{¶ 19} Twining denied ever engaging in domestic violence or being near J.F. on any of the relevant dates. He testified that on Saturday, August 17, 2024, he was in Westerville, Ohio for his aunt's birthday party. Initially, Twining testified that he was in Westerville for the whole weekend, but he later testified that he and his brother were in Westerville until 7:30 pm or 8:00 pm. Still later, he testified that they left Westerville around 5:30 pm. After the magistrate pointed out the discrepancies in Twining's testimony about his departure time from Westerville, Twining testified that he thought they left Westerville around 5:00 p.m.

{¶ 20} To corroborate his testimony, Twining proffered a printout of his Google Timeline from that day, which the court admitted. Twining testified about Google Timeline as follows:

> Q. So do you have a way to monitor where you travel through your phone?
> A. Yeah, I don't think anybody has a choice. And I think it tracks your phone no matter what. And I didn't know you can hack it. Or do anything. I don't know how you can subsidize your timeline. But yeah, it has, it has me there in Westerville, Ohio.
> Q. So you have a Google Timeline on your phone?
> A. Yes.
> Q. How does that work to your knowledge?
> A. I think it just records your time, I guess, I have no idea how it works.
> Q. But you were able to pull up a Timeline for your Google Timeline that shows where you have been?
> A. Yes.

Twining expressly denied modifying any of his Google Timelines.

{¶ 21} The Google Timeline provided by Twining for August 17, 2024 contains a map showing the locations where Twining traveled that day followed by a list of some of the locations along with the times he arrived in those locations. The list states he left Perrysburg, Ohio at 8:30 a.m., then traveled to Bowling Green, Ohio, arriving there at 9:18 a.m. The list contains no further entries. Although the map portion shows that Twining continued to Westerville, Ohio and eventually returned to Perrysburg in a 4 hour and 44 minute round trip, it does not indicate what time Twining returned to Perrysburg. The map portion does not show any travel to Marblehead, nor does it display any additional destinations.

{¶ 22} Twining also submitted a video, which was accepted into evidence, of the birthday party he attended in Westerville. The video does not indicate the time or date when it was recorded. Later, when asked on cross-examination whether the copy of the video admitted into evidence contains that information, C.T said he did not know.

{¶ 23} Next, Twining testified that on August 18, 2024, the date of the second incident, the only place he went was the Kroger located a few miles from his house. Again, he submitted a Google Timeline to corroborate his testimony. The map portion of that date's timeline shows Twining traveling to a nearby Kroger and returning to his home with no other destinations. The list shows Twining leaving his home at 3:44 pm, arriving at Kroger at 3:50 pm, and staying at Kroger until 4:15 pm. The list contains no further entries.

9.

{¶ 24} Twining again submitted a Google Timeline to support his testimony denying that he was in Sylvania on August 25, 2024. Twining testified that on that date he was at home all day, and his Google Timeline shows him remaining at his home address with no travel for that day. He also denied that he owns a dark Jeep and claimed that he knew no one who drives such a vehicle, but he later testified that his brother, Steve, drives a black Jeep Rubicon.

{¶ 25} In addition, Twining submitted a video, which was admitted into evidence and played during the hearing, of Twining accessing and playing portions of his home security system recordings. In his testimony, Twining explained that his home security cameras continuously record regardless of whether motion is detected, and the recordings are available to view on the app for a period of approximately two or three weeks before they are overwritten. Though the cameras continuously record and all of that footage is viewable on the app, the app highlights any portions of the recordings in which motion was detected. The video admitted into evidence is Twining recording himself using his tablet to open the app for his home security system, scrolling to the recordings for August 25, 2024, and playing short portions of the recordings, primarily selecting portions in which motion was detected. In the portions Twining played in the video, Twining's red Chevy pickup truck with black rims is seen parked in the rear of Twining's driveway. In addition, Twining is seen walking around the rear of his driveway in several clips. Notably, all of the clips in which Twining is visible occur on or before approximately

10.

6:00 p.m., and the video only displays the rear portion of Twining's driveway, not the front portion of the driveway that connects to the road.

{¶ 26} Finally, Twining denied traveling to Marblehead on September 21, 2024, and he denied driving a Honda SUV or knowing anyone who drives such an SUV. He again submitted a video of himself using his home security system app on his tablet to review recordings from that date. In this video, Twining played a clip of a security video recorded by a camera pointing toward the front of his property, showing the front portion of Twining's driveway that connects to the road. In that clip, Twining could be seen walking down his driveway to the road and returning back to his house at approximately 2:30 pm.

{¶ 27} Twining also testified about his firearms. He claimed that when he took service of the ex parte DVCPO at the Wood County Sheriff's Department, he mistakenly believed that he was only required to turn over firearms he had on his person at that time. He also testified that he had given all of his firearms—other than those found by Deputy Leek on September 23—to his brother, Steve, a few weeks before he was served with the ex parte DVCPO.

**D. The Trial Court's Order**

{¶ 28} After the hearing, both parties issued proposed findings of fact and conclusions of law. On October 28, 2022, the magistrate issued a DVCPO, finding J.F.'s testimony regarding Twining's prior domestic violence and Twining driving by J.F. in Marblehead and Sylvania credible. The magistrate found Twining's testimony not

11.

credible. Finally, the magistrate found that Twining knew or should have known that J.F. "would find seeing [Twining] in areas where he would have no knowledge [J.F.] was present would be concerning and could cause distress," and the magistrate found Twining's "access to weapons and how he 'misunderstood' the form" for the ex parte DVCPO concerning. The magistrate concluded that Twining knowingly caused J.F. mental distress and issued a DVCPO.

{¶ 29} Twining filed objections to the magistrate's decision, primarily arguing that the magistrate's factual findings conflict with the video and Google Timeline evidence and that J.F. had not established that Twining engaged in a pattern of conduct. Thereafter, the trial court conducted a de novo review of the magistrate's decision and issued its own findings, adopting the magistrate's issuance of the DVCPO. The court noted that J.F.'s testimony was "clear and unambiguous," pointed out that the magistrate found J.F. to be credible and Twining not to be credible, and "recognize[d] that electronic evidence can be tampered with and manipulated."

## II. Assignment of Error

{¶ 30} Twining appeals the issuance of the DVCPO, asserting the following assignments of error:

1. The trial court erred in adopting the magistrate's findings despite unrefuted documentary and electronic evidence contradicting the petitioner's testimony, rendering the judgment against the manifest weight of the evidence.

2. The trial court abused its discretion in disregarding objective, time-stamped video and GPS data submitted by Appellant, based solely on speculative concerns about possible manipulation.

3. The trial court erred in finding sufficient evidence to establish the statutory "pattern of conduct" necessary for menacing by stalking under R.C. 2903.211, as Appellee failed to provide evidence of two or more knowing, intentional acts causing fear or mental distress.

### III. Law and Analysis

{¶ 31} To grant a DVCPO, a trial court must find by a preponderance of the evidence that the petitioner or petitioner's family or household members are in danger of domestic violence. *M.R. v. D.R.*, 2024-Ohio-4514, ¶ 12 (6th Dist.), citing *A.B. v. I.E.*, 2024-Ohio-1809, ¶ 24 (6th Dist.), quoting *Spaulding v. Spaulding*, 2021-Ohio-533, ¶ 10 (6th Dist.). (Additional citations omitted.). Domestic violence includes "engaging in a pattern of conduct [that knowingly causes] mental distress" to another person or to the other person's family or household member. *Id.*, quoting R.C. 3113.31(A)(1)(ii) and R.C. 2903.211(A)(1).

{¶ 32} An appellate court reviews the issuance of a DVCPO under a manifest-weight standard of review. *K.H. v. P.M.*, 2025-Ohio-263, ¶ 78 (6th Dist.); *see also Felton v. Felton*, 79 Ohio St.3d 34, 43 (1997) (reviewing the issuance of a domestic violence protection order to determine whether competent, credible evidence supported a finding that the petitioner was in danger of domestic violence). Under a manifest-weight standard of review, an appellate court "will not reverse the trial court's decision if it is supported by some competent, credible evidence going to all the essential elements of the

13.

case." *Smith v. Strong*, 2017-Ohio-6918, ¶ 16 (6th Dist.), citing *Edwards v. Reser*, 2007-Ohio-6520, ¶ 25 (6th Dist.). "Further, on appeal, we presume the validity of the trial court's factual findings because the trial court is in the best position to observe the witnesses and weigh the credibility of the proffered testimony." *Id.*, quoting *Reser* at ¶ 25.

### A. The Credibility of J.F.'s Testimony

{¶ 33} Twining's first two assignments of error concern the trial court's credibility determinations. Twining argues that the trial court's decision was against the manifest weight of the evidence because J.F.'s testimony was not credible and it was contradicted by the electronic evidence submitted by Twining  Twining also contends that the trial court abused its discretion in an evidentiary ruling because the trial court found J.F.'s testimony credible and "arbitrarily disregarded" Twining's security camera footage and Google Timeline records.

{¶ 34} First, although Twining makes nearly identical arguments to support his first and second assignments of error, those arguments are misplaced with respect to his second assignment of error, under which he contends that the trial court abused its discretion in its evidentiary rulings. An evidentiary ruling is one in which a trial court admits or excludes evidence or limits the purpose for which a factfinder may consider certain evidence. *See State v. Middlebrooks*, 2010-Ohio-2377, ¶ 48 (6th Dist.) (describing "a trial court's decision to admit or exclude evidence" as evidentiary rulings). Twining is correct that such rulings are reviewed for an abuse of discretion. *Id.* Contrary

14.

to Twining's arguments, however, evidentiary rulings do not involve the consideration of a witness's credibility or the weighing of evidence. *See State v. Roddy*, 2007-Ohio-4015, ¶ 13 (8th Dist.) (noting that the trial court's consideration of a victim's credibility was not an evidentiary ruling). Here, Twining contends that the trial court abused its discretion in an evidentiary ruling when the trial court "disregarded" his Google Timelines and his security camera footage, but the trial court admitted that evidence without limitation. Accordingly, the trial court did not make an evidentiary ruling adverse to Twining regarding this evidence. Because Twining has not pointed to any evidentiary ruling adverse to him, his second assignment of error is found not well-taken.

{¶ 35} However, Twining properly asserted his challenge to the trial court's credibility determinations under his first assignment of error, which contends that the trial court's judgment was against the manifest weight of the evidence. Twining claims that the trial court's findings that he was in Marblehead, Ohio and Sylvania, Ohio on the four occasions described by J.F. in her testimony were against the weight of the evidence. In support, Twining maintains that J.F.'s testimony was not credible because she alleged he was driving in different vehicles on the four dates, on the occasions when J.F. alleged that Twining was at the boat sales lot she was too far away from the vehicle to have conclusively identified Twining, and J.F. failed to submit any photographic evidence of the vehicles despite likely having a cell phone nearby. Moreover, Twining asserts that J.F.'s allegations of domestic violence are not credible because she admitted that Twining had never been arrested or charged with domestic violence in the past and she had not

15.

previously sought a protection order. In contrast, Twining claims that his testimony was conclusively corroborated by "objective" electronic evidence. In support, he argues that the video of the birthday party was "time-stamped," the Google Timelines provided "unbiased, accurate, and verifiable log[s] of [his] location at relevant times," and the security footage "explicitly showed that [his] vehicle remained on his property and did not leave the premises on the dates in question," and he claims there was "no evidence or credible testimony that this footage or the timeline data was altered, manipulated, or otherwise reliable." In short, Twining argues that his testimony was more credible than J.F.'s testimony.

{¶ 36} Notably, in a manifest-weight review, an appellate court defers to the factfinder on issues of credibility. *Tillimon v. Hollstein*, 2024-Ohio-3346, ¶ 76 (6th Dist.), citing *Suburban Realty L.P. v. MD Vape & Tobacco, LLC*, 2023-Ohio-3198, ¶ 38 (12th Dist.). "Mere disagreement over the credibility of witnesses or evidence is not sufficient reason to reverse a judgment." *Sotnyk v. Guillenno*, 2014-Ohio-3514, ¶ 4 (6th Dist.), citing *Seasons Coal Co. v. City of Cleveland*, 10 Ohio St.3d 77, 81 (1984).

{¶ 37} Here, Twining has failed to point out any inconsistencies in J.F.'s testimony or any other basis for this court to reverse the trial court's finding that J.F.'s testimony was credible. J.F.'s testimony that Twining was in different vehicles on different dates and times was not inconsistent. Twining himself testified that he drove to Bowling Green and then rode in his brother's black Jeep Rubicon for the remaining drive

16.

to Westerville, acknowledging at least one occasion when he occupied different vehicles at different times.

{¶ 38} Next, Twining has presented no evidence to suggest that J.F. was incapable of identifying her ex-husband from a distance of 50 feet. *See State v. Montgomery*, 2024-Ohio-2520, ¶ 41 (3rd Dist.) (holding that conviction was not against manifest weight of the evidence based on testimony of eyewitness who saw defendant's acts from 75 feet away). Moreover, eyewitness testimony need not be supported by a cell phone photo to be credible.

{¶ 39} Finally, evidence of a prior domestic violence conviction, arrest, or protection order is unnecessary for a court to grant a DVCPO. *See State v. Waterhouse*, 2022-Ohio-655, ¶ 11 (5th Dist.), citing R.C. 3113.31 (explaining that "a protection order can be issued without a previous conviction for domestic violence").

{¶ 40} As to Twining's electronic evidence, the trial court was in the best position to evaluate each witness's credibility as to whether that evidence was manipulated. J.F. testified that Twining's Google Timeline was not accurate, and she learned through a quick Google search how a user can modify a Google Timeline. Twining testified that despite relying on that evidence to corroborate his whereabouts, he had no idea that a Google Timeline could be altered by the user, he had no idea how to do that, and he did not alter his Google Timeline. The trial court, as the factfinder, was free to weigh the credibility of each witness and determine Twining's testimony denying he had manipulated his Google Timelines or even possessed any knowledge of the possibility of

17.

manipulation was not credible, particularly in light of Twining's technological expertise and his other statements illustrating his comfort with technology, such as his testimony regarding his home surveillance system and his statement to Deputy Leek regarding his use of "scramblers." Moreover, Twining's credibility was weakened by his attestation to the police that he had no firearms in his possession at the time he was served with the DVCPO.

{¶ 41} Next, even if Twining did not manipulate any of the electronic evidence he presented at the hearing, none of that evidence directly contradicts J.F.'s testimony. Twining testified that Google Timelines are created by tracking his phone's location. Because Google Timelines are tied to a phone's location rather than a person's location, the Google Timelines in the record provide evidence concerning the location of Twining's phone, not of Twining himself. Twining could have left his phone at home while traveling to Marblehead or Sylvania to avoid having his phone track his location. Indeed, J.F. testified that she saw Twining outside her travel trailer in Marblehead on August 17 and 18 in the evening hours, and both of Twining's timelines from those dates show that his phone was at home in the evening hours. Likewise, Twining's Google Timeline from August 25, 2024 merely shows that his phone was in his home all day.

{¶ 42} Similarly, none of Twining's videos directly contradict J.F.'s testimony. J.F. testified that on August 25, 2024, she saw Twining driving a dark Jeep SUV while she was dropping off her daughter's friend. She could not remember what time it was, but she estimated that it was sometime in the late afternoon or evening. Twining's

18.

security footage from August 25 shows a few instances of Twining in the rear portion of his driveway until approximately 6:00 p.m., no video of the front portion of Twining's driveway, and the presence of Twining's red truck—which is not the vehicle J.F. saw on August 25—in the rear portion of the driveway. Sylvania, Ohio is approximately a 30-minute drive from Twining's home in Perrysburg, Ohio, and consistent with J.F.'s testimony and the video shown at the hearing, Twining could have been picked up by someone in a dark Jeep after 6:00 p.m. and made it to Sylvania sometime later that evening. Next, Twining's home security footage from September 21 shows him in his driveway at approximately 2:30 p.m. J.F. testified that she saw Twining in a Honda SUV in Marblehead around 5:30 p.m. The drive from Perrysburg, Ohio to Marblehead, Ohio takes approximately an hour, giving Twining sufficient time to walk down his driveway at 2:30 p.m. and then get a ride to Marblehead by 5:30 p.m. Finally, Twining's video of the family birthday party he attended in Westerville, Ohio contains no information to indicate when it was recorded.

{¶ 43} The trial court was in the best position to evaluate the witnesses' testimony, and Twining has failed to point to any grounds for this court to reverse the trial court's credibility determinations. Accordingly, Twining's first assignment of error is not well-taken.

**B. Pattern of Conduct**

{¶ 44} In his third assignment of error, Twining contends that the trial court erred in finding a pattern of conduct because J.F. "failed to provide evidence of two or more

knowing, intentional acts causing fear or mental distress." In support, Twining argues that J.F.'s testimony described "merely isolated incidents of coincidental proximity" without any threats or other intentional acts directed at J.F. Twining also maintains that the record contains no evidence that he "knowingly engaged in behavior intended to threaten or cause mental distress to [J.F.]."

{¶ 45} For purposes of a protection order, a "pattern of conduct" is "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents." R.C. 2903.211(D)(1). The actions must be considered as a whole, and they may constitute a pattern of conduct "even if some of the person's actions may not, in isolation, seem particularly threatening." *Ensley v. Glover*, 2012-Ohio-4487, ¶ 10 (6th Dist.), quoting *Guthrie v. Long*, 2005-Ohio-1541, ¶ 12 (10th Dist.).

{¶ 46} Next, "mental distress" means "any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services." R.C. 2903.211(D)(2)(b). Establishing mental distress "does not require that the victim actually experience mental distress, but only that the victim believes the stalker would cause mental distress or physical harm." *Welborn-Harlow v. Fuller*, 2013-Ohio-54, ¶ 26 (6th Dist.), quoting *Bloom v. Macbeth*, 2008-Ohio-4564, ¶ 11 (5th Dist.). No direct threats are necessary. *P.A. v. Rorick*, 2023-Ohio-4578, ¶ 30 (6th Dist.). Instead, "[t]he reasonableness of the

20.

fear felt by the petitioner is determined with reference to the petitioner's history with the respondent." *Spaulding v. Spaulding*, 2021-Ohio-533, ¶ 12 (6th Dist.), quoting *Kiedrowicz v. Kiedrowicz*, 1999 WL 197793, *4 (6th Dist. Apr. 9, 1999). Moreover, "[s]talking by its very definition requires examination of the offender's past conduct involving the victim." *J.F. v. A.F.*, 2022-Ohio-441, ¶ 37 (5th Dist.)

{¶ 47} "[T]he testimony of the victim herself as to her fear is sufficient to establish mental distress." *Spaulding* at ¶ 10, quoting *Ensley* at ¶ 13. For example, a victim's testimony regarding a change in routine can establish mental distress. *See, e.g., P.N. v. A.M.*, 2021-Ohio-1163, ¶ 44 (7th Dist.) (holding that mental distress was established when the victim limited the use of backyard to avoid the alleged stalker); *Morton v. Pyles*, 2012-Ohio-5343, ¶ 24 (7th Dist.) (explaining that a change in the victim's work route, meal times, or exercise times to avoid the alleged stalker would be sufficient to establish mental distress).

{¶ 48} Finally, a person acts "knowingly" when, "regardless of purpose, …the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B).

{¶ 49} Here, J.F. testified that Twining was either following or watching her on three dates during an eight-day period, all close in time. Twining's acts in watching J.F. at her travel trailer in Marblehead and following her in Sylvania were intentional acts that Twining would have known would probably cause J.F. mental distress. J.F. testified that

21.

Twining physically and emotionally abused her and her children in the past. She testified that Twining had also tracked both her phone and her son's phone in the past, and she suspected he was somehow tracking her again because Twining should have no way to know the location of her travel trailer in Marblehead or that she would be in a different neighborhood dropping off her daughter's friend. She also testified that she actually experienced mental distress, stating that she stopped taking neighborhood walks and was constantly "on alert" and "looking over her shoulder."

{¶ 50} Based on the foregoing, competent, credible evidence supports the trial court's finding that the incidents were closely related in time to establish that a pattern of conduct existed, that Twining acted knowingly, and J.F. experienced mental distress. Twining's third assignment of error, therefore, is found not well-taken.

## IV. Conclusion

{¶ 51} The trial court's issuance of the DVCPO was not against the manifest weight of the evidence and therefore Twining's assignments of error are found not well-taken. The judgment of the Lucas County Court of Common Pleas, Domestic Relations Division is affirmed. Twining is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.
_____
JUDGE


Gene A. Zmuda, J.
_____
JUDGE


Charles E. Sulek, P.J.
CONCUR.
_____
JUDGE


This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.